[No. H004920. Sixth Dist. Feb. 15, 1990.]

HENRY J. BLANKENHEIM et al., Plaintiffs and Appellants, v. E. F. HUTTON & COMPANY, INC., et al., Defendants and Respondents.

1464

COUNSEL

John W. Clark, Patricia A. Welch and Clark & Korda for Plaintiffs and Appellants.

Walter R. Allan, Edward V. Anderson, Patricia H. McCall, Barbara R. Shufro, Donna L. Timmerman, Pillsbury, Madison & Sutro, Charles H. Brock and Hoge, Fenton, Jones & Appel for Defendants and Respondents.

## OPINION

COTTLE, J.—Henry J. Blankenheim and Philip L. Kaefer purchased limited partnership interests in three computer research and development firms and stock in the corporation marketing the partnerships' software. After the investments became worthless, they sued, among others, E. F. Hutton, the stock brokerage firm that sold them their interests, and Hutton's sales representative, F. Sanford Frederickson. E. F. Hutton & Company, Inc., and Frederickson moved for summary judgment and the court granted their motion, ruling that (1) plaintiffs' reliance on Frederickson's representations was unjustifiable as a matter of law, and (2) plaintiffs had waived their alleged claims. As will appear, we reverse the judgment.

### FACTS

Since E. F. Hutton's summary judgment motion was predicated, at least in part, on the contention that plaintiffs were "well-educated and sophisticated businessmen with extensive experience in business finance" who should have known better than to rely on Frederickson's representations, we begin with a summary of plaintiffs' prepurchase educational and business experience.

The more "sophisticated businessman" of the two, Blankenheim, earned his bachelor's degree in accounting in 1960. After graduating, he worked for General Electric until 1965 as an accounting trainee. From 1965 until 1968, he worked for McGraw Hill Publishing Company "put[ting] in the retail order Book Club fulfillment warehousing accounting systems." After that, he worked one and one-half years for Ziff-Davis, initially in accounting and then in "putting in a computerized mail order magazine subscription system." Between 1969 and 1975, Blankenheim was treasurer and chief finance officer of Research Institute of America, a loose-leaf tax service. He became president in 1975 of Autotax, a company providing computerized tax services for tax preparers. When Autotax was acquired by Tymshare in 1978, he became its financial vice-president. In this capacity, he supervised the managers of the computer programmers.

Kaefer also has a bachelor's degree in accounting. After college, he worked as an auditor with Ernst & Ernst for three and one-half years and

then as a controller for a division of Hallmark Cards and a company that provided computer processing to hospitals. In 1976 he joined Tymshare as an accountant and later was made a controller.

Over the years that Blankenheim and Kaefer were employed at Tymshare, they accrued a considerable number of stock options on Tymshare stock. In the summer of 1981 they and fellow employee Tom DeGregori, Tymshare's tax manager, discussed the prospect of liquidating some of the stock and diversifying their investments. DeGregori was particularly enthusiastic about investing in tax shelters, and he suggested to Blankenheim and Kaefer that they contact E. F. Hutton's representative Frederickson about the CRI-II limited partnership.

When plaintiffs visited Frederickson in the summer of 1981, he told them that he was impressed not only with the tax shelter aspects of the CRI-II investment, but also with its potential for making money. He recommended two other computer technology research and development limited partnerships, Primary Computer Partners (Primary) and Gateway Technology Associates (Gateway), as well. Finally, Frederickson recommended that plaintiffs purchase stock in Western Business Computers, Inc. (WBC), a corporation formed for the purpose of marketing computer software that would enable certain software programs to be used with previously incompatible computer systems. In reliance on these recommendations, plaintiffs invested $230,000 in these ventures in 1981 and 1982.

According to the declarations submitted in opposition to E. F. Hutton's and Frederickson's motion for summary judgment, Frederickson made a number of representations to induce plaintiffs to buy the investments. The representations included: (1) that the investments were good; (2) that he knew the principals of WBC; (3) that he had placed other clients in an earlier investment with the same people that was doing very well; (4) that WBC was financially strong; (5) that each limited partnership was an independent investment and not dependent on the success of the other limited partnerships or WBC; (6) that he had invested his own money in these ventures; (7) that E. F. Hutton had invested its pension funds in one of the deals; (8) that the forms they had to fill out were just administrative formalities and did not mean anything; and (9) that the reason plaintiffs needed to execute the forms was because neither Frederickson nor E. F. Hutton was receiving commissions from the sale of the investments.

The "forms" that are the subject of representations number (8) and (9) cited above include (1) private placement memoranda, (2) subscription agreements, and (3) unsolicited tax shelter purchase agreements. Read together, these documents appear to immunize defendants from liability for

any losses connected with the limited partnership investments. We examine each of the documents separately.

## A. *The Private Placement Memoranda*

Located within CRI-II's 110-page private placement memorandum is the disclosure that: "The research and development business of the Partnership is highly speculative. Accordingly, investment in the partnership involves a high degree of risk to the investor and such an investment should only be made with funds for which the investor has no current need and can afford to lose." The private placement memorandum further disclosed five pages of potential risks and advised the investor that CRI-II had no operating history.

Located within Primary's 162-page and Gateway's 167-page private placement memoranda are the disclosures that "THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK AND ARE INHERENTLY ILLIQUID WITH SUBSTANTIAL RESTRICTIONS ON TRANSFER" and that "THE PURCHASE OF THESE SECURITIES WILL ENTAIL A HIGH DEGREE OF RISK. SEE 'RISK FACTORS', PAGE 10." The memoranda go on to identify potential business risks including the warning in the Primary memorandum that the "economic success of the Project and the amount of payments received by the Partnership depend upon successful marketing of the Technology. SUCH MARKETING MUST GENERATE GROSS SALES OF APPROXIMATELY $80,000,000 IN ORDER FOR THE PARTNERS TO RECOUP THEIR INVESTMENTS." Gateway's memorandum had a similar warning that it would have to generate gross sales of over $50 million before investors would recoup their investments. Both memoranda also warned that "INVESTMENT IN THE UNITS IS SUITABLE ONLY FOR PERSONS OF ADEQUATE FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY WITH RESPECT TO THIS INVESTMENT. . . . Units . . . will be sold only to an Investor who . . . is able to bear the economic risk of complete loss of this investment."

At their depositions, Blankenheim stated that he "glanced at" the CRI-II private placement memorandum, and Kaefer admitted that the "140 page" CRI-II private placement memorandum, the "192 page" Gateway private placement memorandum and the "187 page" Primary private placement memorandum that he was shown were the same ones he "read" prior to investing in these ventures.[1]

---

[1] The number of pages in the documents introduced at the deposition differs from the number of pages in the documents filed in the record on appeal. We assume that counsel was including both the subscription agreements and the private placement memoranda in the documents shown to Kaefer at his deposition.

## B. *The Subscription Agreements*

Gateway's twenty-six-page subscription booklet includes a four-page questionnaire which each investor had to complete and a six-page agreement for the investor to sign. In the questionnaire, Kaefer answered "Yes" to, among others, the following statements: "7. I consider myself to be an experienced and sophisticated investor. [¶] 8. I have read the Private Placement Memorandum of Western Computer Partners dated November 18, 1981, am familiar with the terms and provisions thereof, and understand the full nature and risk of investment in the Partnership. [¶] 9. I feel I can afford the complete loss of my investment in the Partnership."

The Primary and CRI-II subscription agreements, executed by both Blankenheim and Kaefer, contain similar warnings. For example, they state: "The undersigned is aware that: [¶] (a) The Partnership has no financial or operating history; [¶] (b) There are substantial risks incident to the ownership of Units in the Partnership, and such investment is speculative and involves a high degree of risk of loss by the undersigned of his entire investment in the Partnership; . . . [¶] (4) The undersigned understands that investment in the Partnership is an illiquid investment. In particular, the undersigned recognizes . . . the lack of any market existing or to exist for these Units . . . [¶] (b) The undersigned must bear the economic risk of investment in the Units for an indefinite period of time . . . [¶] (6) The undersigned represents and warrants to the Partnership and the General Partner that: [¶] (a) The undersigned has carefully reviewed and understands the risks of, and other considerations relating to, a purchase of Units, including the risks set forth under 'Risk and Other Important Factors' in the Memorandum and the considerations described under 'Tax Aspects' in the Memorandum." Additionally, both Blankenheim and Kaefer indicated that the only persons they had relied upon or consulted with about the investments was fellow worker Tom DeGregori.

## C. *The Unsolicited Tax Shelter Purchase Agreements*

Unlike the private placement memoranda and the subscription agreements in which the discussion of risks inherent in the partnership interests was embedded within hundreds of pages of other information, the unsolicited tax shelter agreements are simple, one-page agreements which say nothing other than that E. F. Hutton makes no representations on the merit of these investments and that the investors agree to hold them harmless for any loss.

Specifically, the agreements state: "This is to advise you that my order to buy [the partnership share at issue] was unsolicited by you. I understand

that E. F. Hutton has not passed on the merits of this offering. [¶] In consideration for your acting as broker for my account and risk in this purchase transaction, I agree to hold you free and harmless from any responsibility or loss in this transaction."

Additionally the parties signed a separate letter of release with respect to their investment in Primary. That release states: "This is to confirm to you my understanding of the circumstances surrounding the offering of the above captioned security. I am aware of the fact that you have not passed on the merits of the security nor have you made a due diligence investigation with respect to it. [¶] I understand also that this security is being offered to me on the basis of my investment sophistication, strong financial situation and awareness of the risks involved. [¶] I recognize the fact that this investment does not meet Hutton's usual criteria because of its relatively small capitalization and short operating history. [¶] In consideration for your willingness to act as my broker in this transaction, I agree to hold you harmless from any loss, expense, claim or responsibility arising out of this transaction."

Kaefer stated in his deposition that he understood the unsolicited tax shelter agreement to mean that E. F. Hutton did not want to stand behind that particular offering.

## DISCUSSION

### A. *Standard of Review*

■ "A summary judgment is proper only if there is no triable issue of fact and, as a matter of law, the moving party is entitled to judgment." (*Garcia* v. *Wetzel* (1984) 159 Cal.App.3d 1093, 1095 [206 Cal.Rptr. 251].) In the present case, the trial court determined that there were no triable issues of fact to be decided with respect to defendants' liability because plaintiffs had entered into agreements to hold defendants harmless for any losses. The court also determined that, in view of the disclosures in the agreements, it was unreasonable as a matter of law for plaintiffs to have relied on Frederickson's representations.

In reviewing the grant of a summary judgment, we begin by identifying "the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense . . . ." (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) In the instant case, plaintiffs alleged that Frederickson made numerous misrepresentations to them which caused them to

lose their entire investment.[2] For purposes of this motion, defendants concede that the representations were made.

"Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. [Citations.] The motion must stand self-sufficient and cannot succeed because the opposition is weak. [Citations.]" (*AARTS Productions, Inc.* v. *Crocker National Bank, supra,* 179 Cal.App.3d at pp. 1064-1065.)

B. *Showing Re: Hold-harmless Agreements*

■ E. F. Hutton first claims that it is entitled to judgment because of the hold-harmless agreements by which plaintiffs agreed to hold E. F. Hutton harmless for any loss arising out of their investments. Such hold-harmless agreements have been upheld in numerous cases. (See e.g., *Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309, 318 [195 Cal.Rptr. 90]; *Coates* v. *Newhall Land & Farming, Inc.* (1987) 191 Cal.App.3d 1, 7 [236 Cal.Rptr. 181].) Plaintiffs contend that the particular hold-harmless agreements they signed, however, are contrary to law, based on Civil Code section 1668,[3] which provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." ■ Section 1668 reflects the policy of this state to look with disfavor upon those who attempt to contract away their legal liability to others for the commission of torts. (Prosser & Keeton, Torts (5th ed. 1984) § 68, pp. 482-483.) Under this section, a party may not contract away liability for fraudulent or intentional acts or for negligent violations of

---

[2] Plaintiffs alleged in their complaint that Frederickson made the following representations: "(a) Defendants had diligently researched and investigated the essential facts of the investments and Defendants had special skill and confidence to recommend investments such as research and development limited partnerships. [¶] (b) Defendants would supervise and continue to monitor the investments throughout the relationship between Plaintiffs and Defendants. [¶] (c) The investments in the limited partnerships and [WBC] were good, high quality and safe investments for Plaintiffs. [¶] (d) [Business Systems Technologies, Inc. (BST), a nonparty] would successfully research and develop the technologies of the limited partnerships and [WBC] would successfully exploit the technologies in the marketplace for the limited partnerships. [¶] (e) Plaintiffs would realize a substantial profit on the investments in the limited partnerships and Western/Liberator. [¶] (f) BST and [WBC] were financially strong companies and each limited partnership was an independent investment and not dependent on the success of the other limited partnerships or upon the success of Western/ Liberator. [¶] (g) The tax benefits to the Plaintiffs would be substantial and were secure as there was no risk that the deductions to the limited partners or other tax benefits would be disallowed by federal or state governmental agencies."

[3] Unless otherwise stated, all further statutory references are to the Civil Code.

statutory law. On the other hand, " 'a contract exempting from liability for *ordinary* negligence is valid where *no public interest* is involved . . . and no statute expressly prohibits it . . . .' [Citation.]" (*Gardner* v. *Downtown Porsche Audi* (1986) 180 Cal.App.3d 713, 716 [225 Cal.Rptr. 757], italics in original; see also *Hulsey* v. *Elsinore Parachute Center* (1985) 168 Cal.App.3d 333 [214 Cal.Rptr. 194]; *Madison* v. *Superior Court* (1988) 203 Cal.App.3d 589 [250 Cal.Rptr. 299]; *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].)

■ The gravamen of each cause of action against E. F. Hutton and Frederickson is that Frederickson *negligently* made representations which led to plaintiffs' injuries.[4] The issue presented, therefore, is whether negligent misrepresentation is ordinary negligence which a party may contract away or whether it falls under the rubric of fraud for which there can be no exemption from liability.[5] As the statute does not provide a clear answer, we are called upon to construe it. The applicable rules of statutory construction are stated in *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 23 [110 Cal.Rptr. 144, 514 P.2d 1224] and *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 17-18 [194 Cal.Rptr. 722] and need not be repeated here. ■ Suffice it to say that the controlling rule is that statutes are to be construed as a whole, with each part supplying meaning to the other.

Section 1668 provides that contracts exempting a party from liability for "fraud" are against the policy of the law. Section 1572, which was enacted with section 1668 in 1872 as part of the original Civil Code, defines "fraud" as, among other things, the "positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true."[6] Moreover, case law has long held that negligent

---

[4] Plaintiffs' complaint alleged causes of action for breach of fiduciary duty through negligent misrepresentation, negligent misrepresentation, and conspiracy to breach fiduciary duty through misrepresentation.

[5] The two opinions discussing the question have provided different answers. In *Tokio Marine & Fire Ins.* v. *McDonnell Douglas Corp.* (1980) 617 F.2d 936, 940, the Second Circuit Court of Appeals, applying California law, held that section 1668 did not apply to claims for negligent misrepresentation in a commercial transaction. More recently, the court in *Continental Airlines Inc.* v. *McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 401-404 [264 Cal.Rptr. 779] held that an exculpatory clause in a contract for the sale of an airplane, wherein the buyer agreed to waive all claims for negligence, was not a bar to the buyer's claim against the manufacturer for negligent misrepresentation because "negligent misrepresentation is included within the meaning of the word 'fraud' in section 1668." To date, there have been no cases discussing the issue in a consumer context such as presented here.

[6] Compare this definition of "negligent misrepresentation" as "fraud" with the definition of "negligent misrepresentation" as "deceit" in section 1710, subdivision 2., i.e., the "assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be

misrepresentation is included within the definition of fraud. (See, e.g., *Gagne v. Bertran* (1954) 43 Cal.2d 481, 487-488 [275 P.2d 15]; *In re Cheryl E.* (1984) 161 Cal.App.3d 587, 599 [207 Cal.Rptr. 728].)

■ Thus, a contract which exempts a party from liability for his own positive assertions, made in a manner not warranted by the information, which are untrue, is against the policy of the law. In the present case, the hold-harmless agreements attempted to exempt E. F. Hutton from all responsibility for its own misrepresentations. It follows that such an agreement is void as against the policy of the State of California.[7]

Because of this holding, we need not reach three other issues raised by plaintiff as to why the hold-harmless agreements are unenforceable. Nevertheless, we feel compelled to observe that if, as plaintiffs allege, they were induced to enter into the waiver agreements based on Frederickson's representations that they meant nothing and that they were necessary only because he was not getting a commission, this would be an independent reason for voiding the waiver agreement. (See e.g., *Vai v. Bank of America* (1961) 56 Cal.2d 329, 344 [15 Cal.Rptr. 71, 364 P.2d 247]; *Danzig v. Jack Grynberg & Associates* (1984) 161 Cal.App.3d 1128, 1138 [208 Cal.Rptr. 336], cert. den. (1985) 474 U.S. 819 [88 L.Ed.2d 55, 106 S.Ct.67].) Whether plaintiffs' allegations were true, of course, would be a question of fact for the jury to decide.

## C. *Showing Re: Justifiable Reliance*

■ E. F. Hutton also claims that it is entitled to judgment because plaintiffs' reliance on Frederickson's representations was unreasonable *as a matter of law.* Since justifiable reliance is an essential element of a cause of action for negligent misrepresentation, then, without it, plaintiffs' claims must fail. (*Walters v. Marler* (1978) 83 Cal.App.3d 1, 17 [147 Cal.Rptr. 655].) In support of this argument, E. F. Hutton presented evidence that plaintiffs were sophisticated businessmen and that they were given information in the private placement memoranda, subscription agreements and

---

true." (§ 1710, subd. 2.) While the two concepts overlap, actual fraud arises only out of a contractual relationship, as here. In contrast, deceit arises out of the obligation of every person "without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights." (§ 1708.) (See Miller & Starr, Cal. Real Estate (2d ed. 1989) § 1:102, pp. 321-323.)

[7]The Restatement Second of Contracts and the modern trend are in accord: there can be no exemption from liability for *any* misrepresentation. Restatement Second of Contracts section 196 states: "A term unreasonably exempting a party from the legal consequences of a misrepresentation is unenforceable on grounds of public policy." Comment a. points out that this rule "applies to non-fraudulent as well as fraudulent misrepresentations."

hold-harmless letters which contradicted the representations upon which plaintiffs allegedly relied.

■ *Seeger* v. *Odell* (1941) 18 Cal.2d 409, 414-415 [115 P.2d 977, 136 A.L.R. 1291], the leading case on justifiable reliance, sets forth the following rules: "A fraudulent misrepresentation is one made with the knowledge that it is or may be untrue, and with the intention that the person to whom it is made act in reliance thereon. [Citations.] It must appear, however, not only that the plaintiff acted in reliance on the misrepresentation but that he was justified in his reliance. [Citations.] He may not justifiably rely upon mere statements of opinion, including legal conclusions drawn from a true state of facts [citations], unless the person expressing the opinion purports to have expert knowledge concerning the matter or occupies a position of confidence and trust. [Citations.] If, however, the opinion or legal conclusion misrepresents the facts upon which it is based or implies the existence of facts which are nonexistent, it constitutes an actionable misrepresentation. [Citations.] . . . Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man. Exceptionally gullible or ignorant people have been permitted to recover from defendants who took advantage of them in circumstances where persons of normal intelligence would not have been misled. [Citations.] 'No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' [Citation.] *If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery.* [Citations.] 'He may not put faith in representations which are preposterous, or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth. . . .' [Citation.]" (Italics added.)

■ E. F. Hutton first argues that, in light of plaintiffs' business sophistication, any reliance on Frederickson's representations was manifestly unreasonable. While we agree that plaintiffs and coworker DeGregori were well educated and were experts in the accounting and taxation areas, we do not agree that their experience gave them expertise in the computer technology research and development or limited partnerships fields. Any experience Blankenheim acquired *subsequent to* purchasing the partnership interests is irrelevant with respect to his reliance on Frederickson's representations at the time of sale.

E. F. Hutton next argues that the private placement memoranda, subscription agreements and hold-harmless agreements were replete with warnings of the high risk involved which contradicted the representations upon which plaintiffs claim to rely. However, many of the representations that Frederickson allegedly made were not inconsistent with the disclosures of

risk in the private placement memoranda, the subscription agreements or the unsolicited tax shelter agreements. While those documents, for example, advised plaintiffs that the companies were undercapitalized and that investment was risky, they did not warn that the failure of one company would lead to the failure of all the others. In their respondents' brief, E. F. Hutton points to language found on pages 14 and 24 of Primary's 162-page private placement memorandum in which it is disclosed that "The General Partner has caused to be formed two previous limited partnerships to engage in research and development activities [which] compete for BST's research and development resources" and that if "the research being conducted by BST on the fourth project is unsuccessful, there will be little if any possibility that the research to be conducted on behalf of the Partnership will be successful." However, the other competing partnerships are not identified in the documents. The warnings, therefore, do not contradict the representations of independence upon which plaintiffs claim to have relied.

Additionally, plaintiffs allege that defendants told them that they "would supervise and continue to monitor [plaintiffs'] investments . . . ." Relying on this representation and statements from Frederickson that their *earlier* investments were doing well, plaintiffs continued, over a two-year period, to buy *additional* interests. On the summary judgment motion, defendants attempted to contradict these representations by citing sections of the private placement memoranda which place sole responsibility for management of the partnerships in the general partner. Defendants contend that these passages show that any "purported supervision would be of no effect." This argument, however, misses the point. Plaintiffs did not expect Frederickson to supervise the partnerships; they expected him to monitor their investments, see if they were progressing properly and, if they were not, disclose the fact and not suggest that they purchase additional interests. Whether plaintiffs' reliance on this representation was reasonable is a question of fact to be determined by the jury.

■ Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact. (*Arthur L. Sachs, Inc.* v. *City of Oceanside* (1984) 151 Cal.App.3d 315, 323 [198 Cal.Rptr. 483].) "What would constitute fraud in a given instance might not be fraudulent when exercised toward another person. The test of the representation is its actual effect on the particular mind . . ." (*Wilke* v. *Coinway, Inc.* (1967) 257 Cal.App.2d 126, 138 [64 Cal.Rptr. 845].) ■ Additionally, the law is well settled in California that the relationship between a stockbroker and his customer is fiduciary in nature, imposing on the former the duty to act in the highest good faith toward his customer. (*Twomey* v. *Mitchum, Jones & Templeton, Inc.* (1968) 262 Cal.App.2d 690, 709 [69 Cal.Rptr. 222];

*Hobbs* v. *Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 201 [210 Cal.Rptr. 387]; *Duffy* v. *Cavalier* (1989) 215 Cal.App.3d 1517, 1534 [264 Cal.Rptr. 740].) In this case, E. F. Hutton has failed to establish facts which negate plaintiffs' claim that they were damaged as a result of misrepresentations by their stockbroker. Accordingly, the summary judgment in favor of defendants must be overturned.

The judgment is reversed. Costs on appeal to plaintiffs.

Capaccioli, Acting P. J., and Bamattre-Manoukian, J., concurred.

Respondents' petition for review by the Supreme Court was denied May 3, 1990. Panelli, J., did not participate therein.