Filed 6/24/14  Toy v. Chinatrust Bank CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| STANLEY M. TOY, JR.,<br><br>    Cross-complainant and Appellant,<br><br>v.<br><br>CHINATRUST BANK (U.S.A),<br><br>    Cross-defendant and Respondent. | B248567<br><br>(Los Angeles County<br>Super. Ct. No. BC406661) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Joanne O'Donnell, Judge.  Affirmed.

Lizarraga Law Firm, Frank J. Lizarraga, Jr. and Justin M. Crane for Cross-complainant and Appellant.

Saltzburg, Ray & Bergman, Genise R. Reiter and Paul T. Dye for Cross-defendant and Respondent.

Stanley M. Toy, Jr. (appellant) appeals from a judgment entered after the trial court granted summary judgment in favor of Chinatrust Bank (U.S.A.) ("Chinatrust" or respondent) on appellant's claims against respondent for intentional misrepresentation, negligent misrepresentation, and negligent supervision. We affirm.

## FACTUAL BACKGROUND

In September 2006, appellant was introduced to Arlene Shih (Shih) by a business associate. Shih was executive vice president of VIP banking at Chinatrust. Shih opened a Chinatrust VIP account in appellant's name, and later in 2006 opened a $1 million line of credit in appellant's name.

## 1. Appellant's career and business sophistication

Appellant is a physician with an understanding of hospital administration and the inner workings of a hospital, especially the finances and operations. Appellant has been in the business of emergency medicine for close to 30 years and has been asked to participate as a consultant in many different areas of healthcare. He is also skilled at negotiations, and has assisted in negotiating union contracts for hospitals.

In 2005, appellant authored an autobiography while he was the chairman of the Hospitals and Healthcare Delivery Commission for Los Angeles County, an appointed public position. Appellant was also a reserve lieutenant in the Los Angeles County Sheriff's Department, and had been elected to the prestigious international think-tank, the Pacific Council on International Policy.

Appellant has investment experience. He has owned certificates of deposit, mutual funds, stocks, bank savings accounts, and real estate. Appellant has invested with professional advisers such as Morgan Stanley and Smith Barney, but has also invested in stocks without any professional help. Appellant knows that an individual can make or lose money on an investment.

## 2. The Koval investment

In late 2006, appellant informed Shih that he was interested in obtaining funding to acquire a hospital with the ultimate goal of providing health care for the indigent population of Los Angeles. Shih initially told appellant that Chinatrust would make the

loan.  However, Shih later informed appellant that the bank could not provide financial assistance for the acquisition of the hospital.

Shih offered to refer appellant to outside funding sources and act as a liaison between appellant and those sources.  For such referrals, Shih would receive a one percent finder's fee on what appellant received from any investments Shih brought to him.  Appellant agreed to this arrangement.  Shih then introduced appellant to Peter D'Arcy, chief executive officer (CEO) of Sceptre, LLC.  On January 26, 2007, appellant entered into a funding agreement with Sceptre for a $70 million loan, but the agreement automatically terminated for failure to perform.

Thereafter, in May 2007, Shih referred appellant to Emanuel Waters.  Waters was not an employee of Chinatrust.  Rather, as Shih informed appellant, Waters was an outside consultant who had worked for her uncle, and her uncle was a client of Chinatrust.  Around the same time, Shih set up a telephone call between appellant and Waters.  Waters explained to appellant that there were certain private placement programs that were only open to a few select people of high net worth.  Appellant admitted not understanding many of the things that Waters talked about when discussing the private banking placement programs.  Indeed he asked Shih about some of the things Waters said.  Appellant had difficulty sometimes understanding Shih because her English was not perfect.  Shih said she would set up another telephone call between appellant and Waters to satisfy appellant's understanding of the programs Waters was describing.

Waters told appellant he could not handle a deal as small as appellant's but that he would research other possible options for appellant.  Within 24 hours, Waters recommended Gary Koval.  Appellant was aware that Shih did not know Koval, having never met him, nor had she had any dealings with him.

Appellant did not independently investigate Koval.  He recalled asking Shih if Koval's program was a legitimate private placement program, to which she responded that it was.  However, appellant did not ask for any documentation and he never asked Koval for any credentials.

3

As a result of Waters' introduction, appellant and Koval were interested in meeting to discuss Koval's ability to find a source of funds for appellant's project. Shih told appellant that Koval lived in the Monterey area and that they could meet at the Pebble Beach Country Club. Shih arranged the meeting and appellant met with Koval in late May of 2007. Only appellant and Koval attended the meeting.

At the meeting, Koval explained two programs, one involving the World Bank which made loans for humanitarian projects and a second "fast track program" that "within four to six weeks, would generate $100 million." Koval told appellant that he had been in the business for 40 years, but that he only took one to two clients per year. Koval would not discuss the specifics of his business, saying that in this particular business, discussion or disclosure of the nature of the programs is not permitted. Koval represented that he was a Christian man who believed in God. Appellant placed some trust in Koval because of his representations that he was a "God-fearing Christian."

To participate in the fast-track program described by Koval, appellant would have to put up $3 million which would be placed in an escrow account with an attorney in New York. Koval told appellant that with the $3 million as a down payment, he could acquire a $100 million bank guarantee from a major European bank. The bank guarantee would be traded on the European market by an unidentified trader and, after fees, appellant would receive his guaranteed profit of $100 million, all in a matter of four to six weeks. Koval cautioned appellant not to talk to anyone about the investment. When appellant asked if he could speak with a Koval client to verify Koval's representations, Koval indicated that non-disclosure agreements precluded the exchange of conversation between Koval's clients.

Appellant chose to participate in the fast-track program because of the greater and faster return. Appellant ultimately invested the $3 million with Koval. Appellant borrowed the money from Dr. Michael Agron (Agron) and Far Development, Inc. (Far Development). Appellant asked Koval for verification of the escrow account and attorney in New York, which Koval never provided. Instead, Koval changed the plan. Rather than wiring the money into an escrow account, Koval instructed appellant to wire

4

the money into Koval's personal account. Appellant was concerned about the last minute change, but nevertheless wired the money into Koval's personal account as requested.

After the $3 million was transferred to Koval's account, appellant began asking what was happening with the money. Koval told appellant there were delays and gave various excuses. A week after the money was transferred, appellant asked for and got verification that the money was still in Koval's account. Appellant continued to ask for proof that the money had been transferred to an attorney escrow account, but never received verification. Appellant had an opportunity to recall the money, but did not do so despite the signs that Koval was not proceeding in conformance with his representations regarding the investment.

Koval did not honor his commitments and the only money that appellant received was $1,733,340.75 recovered by the sheriff's department and $50,000 returned by Julian Bach, an attorney who assisted in the transfer of the money.

## 3. The Fair Exchange investment

In mid-July 2007, both Agron and Far Development were putting pressure on appellant to repay their loans. Around this time, appellant learned of another investment through Waters. Appellant went to a third party, Vincent Chong, and requested $600,000 to use for the new investment. Ultimately Waters kept $100,000 of the money as a commission, and appellant chose to invest the remaining $500,000 in a transaction involving Fair Exchange Trust, La Salle Bank and European Credit & Trust (the Fair Exchange investment). Based on representations made by an individual associated with both Fair Exchange Trust and European Credit & Trust, appellant understood that he was entering a similar type of investment as the one that Koval had described. He believed he would receive a return of $10 million on his $500,000 investment, within one year. Unlike the Koval investment, appellant did all of his own "due diligence" for the Fair Exchange investment. He relied on a number of sources unrelated to Chinatrust. Ultimately appellant lost all but $42,000 of the Fair Exchange investment.

## 4. Shih's employment and involvement in the Koval investment

Shih began her employment at Chinatrust on June 28, 1996, and eventually rose to the position of Senior Vice President and Team Leader. In 2000, Shih set up a credit line for Harry Chow and his wife. Chinatrust erroneously thought that the Chows knew that their credit line was being utilized. Shih was using the credit line without the Chow's knowledge, and was hiding that information from Chinatrust. Chinatrust did not discover this activity until 2008, after Shih had embezzled money for eight years.

With respect to the issues involving him, appellant notes that Shih sent an email from her Chinatrust email address on June 12, 2007, to Koval. The email contained appellant's banking information at Chinatrust. The email was sent during business hours and appeared to be bank business.

In addition, sometime in late June 2007, appellant entered into an agreement with Shih after she expressed that she was entitled to one million dollars as her personal fee for assisting appellant in obtaining outside funding. Shih wanted the check for her fee to be made out to her son, Anthony Yu, for tax reasons. Appellant found the arrangement odd but made the check payable to Shih's son anyway. Appellant later made out a second check to Shih's son for $300,000. Appellant could not recall why he wrote the second check. Appellant recalled Shih saying that Chinatrust would make money on the deposit and the line of credit in response to appellant's inquiry whether Chinatrust would benefit from the transaction. Shih told appellant that she was entitled to a fee from him and that this was not uncommon. Appellant found the arrangement a bit strange because he understood that Shih was an employee of the bank. It "did raise some red flags," but regardless, appellant went through with the transaction. Appellant did not make any inquiries at the bank as to whether this was how things were done in the normal course of business at the bank.

Appellant does not claim that Shih was involved in the alleged fraud perpetrated by Koval or the banks involved in the Fair Exchange investment. Appellant's testimony shows that Shih introduced appellant to Waters, and it was Waters who recommended

that appellant participate with Koval and the Fair Exchange investments. Appellant was aware that Shih had never met Koval and never had any business dealings with him.

Appellant testified that he asked Shih to verify whether Koval had been successful with the types of programs he was offering to appellant. However, he understood that Shih had never had any prior contact with Koval. In addition, Koval represented to appellant that he had direct contact with the top 20 banks in the world, which did not include Chinatrust. Appellant did not ask Koval whether he had any prior work experience with Chinatrust. In addition, appellant understood that investigating would be difficult given the private nature of Koval's transactions.

There is no direct evidence that Shih investigated Koval. In addition, there is no evidence that if Shih had investigated Koval, she would have found anything giving rise to concern.

## PROCEDURAL HISTORY

The original complaint in this litigation was Far Development's action against appellant. Appellant filed his initial cross-complaint against Chinatrust, Shih, and Waters on April 24, 2009. On July 20, 2009, appellant filed his second amended cross-complaint (SACC) against Chinatrust, Shih, Koval, Waters, and four other individuals. The SACC alleged causes of action against Chinatrust for intentional misrepresentation, negligent misrepresentation, indemnity and contribution, and negligence.[1]

In January 2011, Chinatrust filed a motion for summary judgment against appellant in his cross-complaint, and in the alternative, summary adjudication as to each cause of action.[2] Chinatrust filed a separate statement of undisputed facts as well as an

---

[1]   The cause of action for indemnity and contribution is not discussed by either of the parties to this appeal and therefore will not be addressed in this opinion.


[2]   The motion was filed against pleadings in two related cross-actions: (1) the SACC in the *Far Development v. Toy et al.* action (lead case No. BC406661) and (2) appellant's cross-complaint in a related action captioned *Chong v. Toy et al.* (case No. KC054498). The cross-complaints on which Chinatrust sought summary judgment were identical.

7

appendix of supporting evidence. Chinatrust argued that, as a sophisticated businessperson, appellant could not establish that any purported reliance on alleged representations that led him to invest in transparently fraudulent schemes was reasonable. Further, Chinatrust argued that appellant could not establish that Chinatrust is responsible for any representations made by Shih, who was clearly acting in self-interest. Finally, Chinatrust argued that the doctrine of unclean hands barred appellant's recovery, since appellant made serious misrepresentations to associates regarding the nature of the investment in order to obtain funds from them.

The motion was heard on March 7, 2013. The trial court issued a tentative decision granting the summary judgment in full. As to the fifth and sixth causes of action for intentional and negligent misrepresentation, the trial court indicated that Chinatrust met its burden by providing evidence that appellant did not reasonably rely on any of Shih's representations as a matter of law. Citing *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 865, the court noted that a moving defendant may show that reliance was unreasonable as a matter of law "'if [appellant's] conduct is manifestly unreasonable in the light of his own intelligence or information. It must appear that he put faith in representations that were "preposterous" or "shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth."' [Citation.]" The court concluded that appellant's reliance on Shih's alleged representation that Koval could be trusted with $3 million was manifestly unreasonable given the information that appellant had, including the fact that Shih never met Koval, had never interacted with Koval, and never looked into the legitimacy of Koval's investment. The court further concluded that the reliance was all the more unreasonable based upon the fact that Koval guaranteed a 3,233 percent return on appellant's investment in less than a few months, and the additional suspicious fact that Koval would not allow appellant to do any research or conduct any inquiry into the investment. The court concluded that appellant produced no evidence creating a triable issue of material fact as to reasonable reliance.

8

As to appellant's 11th cause of action for negligent hiring and supervision, the trial court noted that Chinatrust had provided evidence that it required its employees to comply with the law and the bank's regulations. Employees were required to refrain from using customer information for the purpose of furthering their private interests, to act honestly, and to avoid conflicts of interest. Chinatrust conducted a thorough background check on Shih before hiring her, held routine meetings to ensure that employees understood the standards of conduct, and conducted audits. The trial court found this was sufficient evidence for Chinatrust to meet its initial burden of showing conduct in accord with professional standards. The trial court further found that appellant failed to make a showing that Chinatrust acted below the standard of care. Appellant provided evidence that Shih was personally using a line of credit that belonged to a customer from 2000 through 2007, but provided no evidence establishing that Chinatrust could have discovered the fraud had it acted reasonably. Thus, summary adjudication of appellant's negligence cause of action was appropriate.

Finally, the trial court addressed appellant's 10th cause of action for indemnity. The court found that the equitable indemnity claim was derivative of the claims described above, and that summary adjudication was therefore proper.

After hearing the arguments of counsel, the trial court adopted its tentative ruling as the order of the court.

On May 7, 2013, appellant filed his notice of appeal.[3]

## DISCUSSION

### I. Standard of review

The standard of review for an order granting or denying a motion for summary judgment or adjudication is de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).) The trial court's stated reasons for granting summary relief are not

---

[3]  Appellant's notice of appeal referenced both superior court case No. BC406661 (*Far Development v. Toy et al.*) and No. KC054498 (*Chong v. Toy et al.*). Because the corresponding causes of action alleged in each cross-complaint are identical, we will discuss them as one.

9

binding on the reviewing court, which reviews the trial court's ruling, not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

A party moving for summary judgment "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar, supra*, 25 Cal.4th at p. 850, fn. omitted.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*, fn. omitted.) "A defendant bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. [Citation.]" (*Ibid.*)

Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.]" (*Aguilar, supra*, 25 Cal.4th at pp. 850-851, fn. omitted.)

## II. Negligent and intentional misrepresentation

### A. Elements of the causes of action

The elements of a cause of action for negligent misrepresentation are: (1) the misrepresentation of a past or existing material fact; (2) without reasonable ground for believing it to be true; (3) with intent to induce another's reliance on the fact misrepresented; (4) justifiable reliance on the misrepresentation; and (5) resulting damage. (*National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.* (2009) 171 Cal.App.4th 35, 50.)

The elements of a cause of action for intentional misrepresentation are: (1) a misrepresentation, which includes a concealment or nondisclosure; (2) knowledge of the falsity of the representation; (3) intent to induce reliance on the misrepresentation; (4)

justifiable reliance; and (5) resulting damage. (*Cadlo v. Owens-Illinois, Inc.* (2004) 125 Cal.App.4th 513, 519 (*Cadlo*).)

Both causes of action require a false statement, and justifiable reliance on that statement. "Actual reliance occurs when the defendant's misrepresentation is an immediate cause of the plaintiff's conduct, altering his legal relations, and when, absent such representation, the plaintiff would not, in all reasonable probability, have entered into the transaction. [Citation.]" (*Cadlo, supra*, 125 Cal.App.4th at p. 519, citing *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976.)

### B. Alleged misrepresentations

Appellant has alleged the following misrepresentations: Shih assured appellant that Waters was trustworthy in his recommendations. She also assured appellant that Koval was a securities dealer and that the investment program was a legitimate program. When appellant asked Shih to verify the legitimacy of the Koval investment, she did so within a few days. Appellant later stated that his request to Shih was more of a verification of Koval himself, not the program. However, appellant did not request anything in writing regarding Shih's alleged assurance that Koval was a legitimate individual or that Koval had a legitimate program. He never asked for any proof of Shih's alleged investigation.[4]

As to these alleged misrepresentations, appellant must show that there is a triable issue of material fact as to reasonable reliance.

---

[4] Appellant asserts in his opening brief that he relied on Shih's assertion that a bank requirement of $10 million for a $70 million loan was a legitimate business practice, and that he relied on Shih's advice that the Memorandum of Understanding that he signed in connection with the Koval investment was a sound contract. However, appellant has not provided a citation to any evidence supporting these assertions. Therefore we must disregard the assertion.

*C. Appellant has not shown a triable issue of material fact as to reasonable reliance*

Appellant argues that his reliance on Shih, as vice president of VIP banking, was completely reasonable.[5]  His argument, in sum, is that Shih's title, and association with a well-established bank, is sufficient to create a triable issue of material fact as to reasonable reliance.

Chinatrust points out that "'[i]f the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, . . . he will be denied a recovery.'  [Citation.]"  (*Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 54 (*Kruse*), citing *Seeger v. Odell* (1941) 18 Cal.2d 409, 415.)  As the *Kruse* court pointed out, "hopeful expectations cannot be equated with the necessary justifiable reliance." (*Kruse*, at p. 55.)

The facts here show that appellant understood that an individual can make money on an investment or lose money on an investment.  Thus appellant was aware of the risk of making any investment.  He was also aware that Chinatrust had turned down his request for funding.  Shih agreed to refer his request to an outside source but only for a substantial finder's fee, in the form of $1.3 million in checks made out to Shih's son. Appellant admitted that the transaction raised some red flags, but he did not make any inquiries at Chinatrust to determine whether such a transaction was acceptable.

Shih initially introduced appellant to the CEO of Sceptre. Appellant entered into an agreement with that company for a $70 million loan.  This deal fell through.

After his two initial failed attempts to obtain financing for his project, Shih introduced appellant to Waters.  Waters also rejected appellant's request for funding, but referred appellant to Koval.  Appellant knew that Shih had never met Koval and had never worked with him.  Appellant also knew that due to the secret nature of Koval's

---

[5]      Appellant also argues that Shih was a lending officer and that Shih's job duties included going to various doctor's offices to solicit their deposit and lending business. However, appellant has provided a citation to a motion, rather than evidence, in support of this statement, therefore it is disregarded.

business, a diligent background investigation would be impossible to perform. Nevertheless, less than three days after asking, he took Shih's word that Koval was an upstanding individual. Appellant sought nothing in writing confirming any due diligence or Shih's personal endorsement of Koval.

Appellant's purported reliance on Shih's word, when Shih was clearly self-dealing and knew nothing of Koval, is manifestly unreasonable. Even the vice president of VIP banking at a well-known bank cannot make a legitimate recommendation for a person she has never met and with whom she has never worked. This is particularly true where appellant was aware that a background investigation was impossible because Koval's transactions were shrouded in secrecy.

Yet another red flag was raised when Koval changed the payment instructions at the last minute, requesting that appellant wire $3 million to his personal bank account rather than the neutral escrow agent who was supposed to receive the money. Appellant again ignored this warning and continued with his foolish investment. Appellant does not allege that he checked with Shih regarding the wisdom of going along with Koval's last-minute change of plans. Under the circumstances, appellant cannot claim he was unaware that he was taking a serious risk with the money, or that Shih advised him to do so. A person of reasonable intelligence and moderate investment experience could not, in the face of so many warning signs, claim justifiable reliance on a recommendation from an individual who had never worked with, or even met, Koval.

Appellant emphasizes that reasonable reliance is generally an issue of fact for the trier of fact to decide. "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact. [Citation.]" (*Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1475.) "However, whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts. [Citation.]" (*Guido v. Koopman* (1991) 1 Cal.App.4th 837, 843.)

*Kruse* is instructive. There, the owner of an apple processing plant sued a bank for fraud. The owner's theory, in part, was that the bank induced him to repeatedly obtain

short-term loans while representing that they would ultimately give a long-term loan. The appellate court reversed a nearly $47 million jury award, based in part on its determination that there was insufficient evidence as a matter of law to establish the element of justifiable reliance. The court explained, "a party plaintiff's misguided belief or guileless action in relying on a statement on which no reasonable person would rely is not justifiable reliance. [Citation.]" (*Kruse, supra*, 202 Cal.App.3d at p. 54.)

No reasonable person would rely on Shih's alleged endorsement of Koval under the circumstances. She did not know him; she had never worked with him. Her approval came within days of appellant's request, and was not supported by any documentary evidence. She was personally collecting $1.3 million for her peripheral involvement. Red flags regarding the motives of both Shih and Koval were too blatant to ignore. We have no trouble determining that reasonable minds can come to only one conclusion: appellant's alleged reliance on Shih's endorsement of Koval was not justified. Therefore, his claims against Chinatrust for intentional and negligent misrepresentation were properly disposed of on summary judgment.[6]

## III. Negligent retention or supervision

### A. Elements of the cause of action

The elements of a cause of action for negligent hiring or retention are: (1) a legal duty to use reasonable care; (2) a breach of that duty; (3) proximate or legal cause between the breach and (4) the plaintiff's injury. (*Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1139 (*Phillips*).)

Generally, "'[a]n employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit. [Citation.]' [Citation.]" (*Phillips, supra*, 172 Cal.App.4th at p. 1139.) "Negligence liability will be

---

[6] Because we have determined that appellant cannot, as a matter of law, set forth a cause of action against Shih for negligent or intentional misrepresentation, we need not address the parties' competing arguments regarding whether or not Chinatrust was liable for Shih's statements under the doctrines of respondeat superior or ratification.

imposed on an employer if it 'knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes.' [Citation.]" (*Ibid.*) "'Liability for negligent . . . retention of an employee is one of direct liability for negligence, not vicarious liability. [Citation.]' [Citation.]" (*Id.* at pp. 1139-1140.)[7]

### B. *Appellant's theory of liability*

Appellant does not argue that Chinatrust was negligent in hiring Shih. Instead, appellant argues that there is a triable issue of material fact as to whether Chinatrust was negligent in training, retaining, supervising, or otherwise controlling Shih.

In support of his argument, appellant points out that starting in the year 2000, and continuing until she left Chinatrust's employ in December 2007, Shih was personally utilizing a line of credit that belonged to a customer of Chinatrust. The embezzlement and fraud went undetected by Chinatrust for eight years, and was not discovered until June 2008 when Shih's replacement asked the customer to renew his line of credit. During the eight years that the fraud was undetected, Chinatrust required dual controls of every transaction, an independent annual audit, and review of transaction logs. According to the CEO of Chinatrust, Shih thwarted these controls by remaining the sole contact for her customers. Further, since July 2004, Chinatrust had the ability to search and monitor the company's private email system.

Appellant maintains that, had Chinatrust complied with generally accepted practices in connection with auditing its employees for compliance with its practices, Chinatrust would have discovered Shih's embezzlement at some point.

---

**7** Chinatrust asserts, without citation to legal authority, that if appellant's negligent and intentional misrepresentation claims against Chinatrust fail, that his claim for negligent hiring or retention also must fail. Because Chinatrust has failed to support this assertion with reasoned argument and legal authority, we consider it forfeited and will not address it further. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

*C. Appellant has failed to raise a triable issue of fact regarding breach of duty*

In support of its motion for summary judgment, Chinatrust produced evidence that it required its employees to comply with the law and the bank's regulations. Employees were required to refrain from using customer information for the purpose of furthering their private interests, to act honestly, and to avoid conflicts of interest. Chinatrust conducted a thorough background check on Shih before hiring her, held routine meetings to ensure that employees understood the standards of conduct, and conducted audits. This information is sufficient to show that Chinatrust generally acted within the standards of professional conduct.

While appellant insists that Chinatrust should have detected appellant's wrongful behavior, appellant fails to specify how exactly Chinatrust could have, or should have, done so. Simply put, appellant fails to outline a specific failing that would have uncovered Shih's fraud. Appellant asserts generally that if Chinatrust truly did comply with all generally accepted practices in connection with auditing its employees for compliance with its practices, it would have discovered Shih's embezzlement. However, this unsupported assertion is insufficient to create a triable issue of fact.

"An issue of fact can only be created by a conflict of evidence." (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196.) "[A]n issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions.' [Citation.]" (*Ibid.*) Appellant presents no evidence suggesting that Chinatrust failed to carry out any specific practice, or ignored any specific safeguard, that resulted in its failure to discover Shih's

16

embezzlement.[8]  Simply put, appellant has not presented any factual conflict in the evidence as to what Chinatrust did or did not do to monitor its employees.[9]

## DISPOSITION

The judgment is affirmed.  Respondent is awarded its costs of appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.*
FERNS

---

[8]     In the absence of specific information as to how Chinatrust could have uncovered the fraud, the fact that the embezzlement was not discovered until six months after Shih left Chinatrust's employ illustrates the effectiveness of Shih's cover-up.  Even Shih's replacement did not detect the problem until the client was asked to renew the line of credit.

[9]     Appellant suggests that Chinatrust had the ability to monitor the personal emails of its employees, and implies that it should have done so.  However, appellant does not suggest that the accepted standard of care in the banking industry is to monitor every employee's email on a daily basis in the absence of some reason to believe that an employee is doing something improper.  Even if this were the standard of care, appellant does not present any suspicious emails that should have been discovered or should have alerted Chinatrust to the fraud.  Under the circumstances, Chinatrust's failure to monitor Shih's emails does not create a triable issue of fact as to negligent supervision.

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17