*569 MEMORANDUM **
The Fresno-Madera Federal Land Bank Association, FCLA (“Land Bank”) sued Aron and Carrie Margosian for breaching their guaranty of a $4.8 million restructured loan made to ZM Fresh Special T’s, Inc. (“ZM”), formerly known as ZMC Fresh, Inc. The Margosians asserted cross claims alleging that the Land Bank (1) misrepresented that the guaranty would not expose the Margosians to personal liability for ZM’s indebtedness and (2) obtained their signatures on the guaranty by fraudulently concealing known facts about ZM’s precarious finances. The district court granted summary judgment for the Land Bank and entered a $8.4 million judgment against the Margosians. We reverse in part, affirm in part, and remand.
1. With regard to the fraudulent misrepresentation claim, the district court held that Bank of America v. Pendergrass, 4 Cal.2d 258, 48 P.2d 659 (1935), “precludes the Margosians from introducing parol evidence of a promise directly at variance with the promise in the written agreement.” Onions Etc., Inc. v. Z & S Fresh, Inc., 880 F.Supp.2d 1092, 1108 (E.D.Cal.2012). The California Supreme Court has overruled Pendergrass, so our review takes full account of the parol evidence that the district court discounted. See Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass’n, 55 Cal.4th 1169, 151 Cal.Rptr.3d 93, 291 P.3d 316 (2013).
On the merits, the Margosians’ fraudulent misrepresentation claim turns on whether they “justifiabl[y] reli[ed]” on the Land Bank’s verbal assurance that signing the guaranty would not make them personally liable for ZM’s restructured loan.[1] Alliance Mortg. Co. v. Rothwell, 10 Cal.4th 1226, 1239, 44 Cal.Rptr.2d 352, 900 P.2d 601 (1995) (quoting Molko v. Holy Spirit Ass’n, 46 Cal.3d 1092, 1108, 252 Cal.Rptr. 122, 762 P.2d 46 (1988)). The California Supreme Court has cautioned that “[ejxcept in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiffs reliance is reasonable is a question of fact.” Id. (quoting Blankenheim v. E.F. Hutton & Co., 217 Cal.App.3d 1463, 1475, 266 Cal.Rptr. 593 (1990)). That is, summary judgment is appropriate only when “reasonable minds can come to only one conclusion based on the facts.” Id.
Viewing the evidence in the light most favorable to the Margosians-as we must at the summary judgment stage — the record leaves ample room for a “reasonable difference of opinion” about whether they reasonably relied on the Land Bank’s misrepresentations. Id.
According to the Margosians, in October or November 2008, Martha Hugger, a Land Bank Vice President and Loan Documentation Manager, called the Margosians unexpectedly on the pretense that she happened to be in the area and needed to discuss a “simple formality” with them. Hugger arrived at the Margosians’ home with Rob Frudden, a Land Bank Vice President and Senior Loan Officer. Frud-den had sent the Margosians two letters in July 2008 advising them that ZM’s original loans — which the Margosians had personally guaranteed — were or may be distressed. Perhaps anticipating that the Margosians. had ignored or forgotten about *570 Frudden’s letters—which plainly identified him as a Land Bank Vice President—Hugger introduced Frudden as a new trainee who was just there to observe.
Hugger set a casual tone for the meeting and “talked quite a lot about everything else except th[e] simple formality” that prompted her visit. When Hugger eventually presented the guaranty to the Margosians for signature, Carrie Margo-sian asked what would happen if ZM struggled financially. Hugger initially dodged the question. When Carrie Mar-gosian pressed for an answer, Hugger said the Land Bank could only foreclose on the loan’s collateral-i.e., ZM’s newly constructed warehouse-and would recover any deficiency from two other guarantors: (1) Martin Zaninovich, who co-owned ZM along with Aron Margosian, and (2) Z & S Fresh, Inc. (“Z & S”), a wholesale distribution company that Zaninovich owned by himself. With that reassurance, the Mar-gosians signed a seven-page, single-spaced “Restructure Agreement” identifying them as guarantors and an eight-page, single-spaced “General Continuing Guaranty” purporting, by negative implication, to expose them to personal liability.[2]
According to the Land Bank’s own records, the meeting at the Margosians’ home lasted only thirteen minutes. After the meeting, Frudden congratulated Hugger for “helping Mrs. Margosian, whom [sic] was a little overwhelmed, get comfortable with all of the documents and getting her signature.”
The district court characterized the Land Bank’s alleged actions as “disconcerting,” but gave this evidence insufficient weight when applying the summary judgment standard. Onions Etc., 880 F.Supp.2d at 1103. To the extent the district court faulted the Margosians for not reading or understanding the personal liability provision of the guaranty, a finding of negligence is not fatal to their fraudulent misrepresentation claim. See Rothwell, 10 Cal.4th at 1239-40, 44 Cal.Rptr.2d 352, 900 P.2d 601 (“ ‘Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent.’ ” (quoting Seeger v. Odell, 18 Cal.2d 409, 414, 115 P.2d 977 (1941))).
On the factual record developed below, a judge or jury could find that the Margo-sians acted reasonably. Only someone with extraordinary fortitude and sophistication would not have succumbed to the Land Bank’s pressure tactics (as depicted by the Margosians’ evidence)—i.e., calling out of the blue and asking to make an unscheduled visit to the Margosians’ home, misleading the Margosians as to Frud-den’s position, characterizing the purpose of the visit as a simple formality, and giving a false answer to Carrie Margo-sian’s question about personal liability. At a minimum, summary judgment was not appropriate because a jury could credit the Margosians’ version of events, and if it does, there is “room for a reasonable difference of opinion” about whether the Margosians justifiably relied on Hugger’s assurance that they would not be personally liable for ZM’s restructured loan. Id. at 1239, 44 Cal.Rptr.2d 352, 900 P.2d 601.
2. The Margosians’ other cross claim alleges that the Land Bank fraudulently concealed materials facts about *571 ZM’s precarious financial condition before asking them to guarantee the $4.8 million restructured loan.
Under California law, a creditor must disclose known facts about a debtor’s finances to a prospective surety when, among other things, “the creditor ‘has reason to believe that the facts are unknown to the surety.’ ” Sumitomo Bank of Cal. v. Iwasaki, 70 Cal.2d 81, 93, 73 Cal.Rptr. 564, 447 P.2d 956 (Cal.1968) (quoting Restatement (First) of Security § 124(1) (1941)). Restatement (Third) of Suretyship & Guaranty § 12 (1996) — which expressly derives from Restatement (First) of Security § 124(1) — explains that “whether the obligee has reason to believe that ... facts are unknown to the secondary obligorf] shall be determined in light of the obli-gee’s reasonable beliefs as to (a) the nature of the secondary obligor’s relationship to the principal obligor; (b) the. nature of the secondary obligor’s business; and (c) the secondary obligor’s ability to obtain knowledge of such facts independently in the exercise of ordinary care.” Id. § 12(4). Importantly, the Restatement’s commentary emphasizes that a creditor’s duty to disclose “places no burden on the obligee to investigate for the benefit of the secondary obligor. Nor does it require the obligee to take any particular steps to ascertain whether the secondary obligor is acquainted with facts that the obligee may reasonably believe are known to both of them.” Id. § 12(3) cmt. f.
In May 2008, almost six months before the Land Bank asked the Margosians to guarantee ZM’s restructured loan, Frud-den prepared a Credit Analysis Report in which he concluded that: (1) ZM was financially dependent on Z & S, Zaninovich’s wholesale distribution company; (2) Z & S’s bank had instructed the company to stop using its $5.5 million line of credit to prop up ZM and related entities; and (3) ZM could not “stand alone” financially and would continue to “drain[ ]” Z & S to pay its existing loans.
At the summary judgment stage, the Margosians’ fraudulent concealment claim turns on whether a reasonable judge or jury could find that the Land Bank had reason to believe they were unaware of ZM’s precarious financial position before they guaranteed the $4.8 million restructured loan. The record does not support such a conclusion, even after viewing the evidence in the light most favorable to the Margosians.
In November 2007, Aron Margosian signed a loan agreement, promissory note, and security agreement with the Land Bank identifying himself as ZM’s “Treasurer.” When ZM accepted the Land Bank’s proposal for a restructured loan in August 2008, Aron Margosian certified that he was ZM’s “Secretary” and “Chief Financial Officer/Treasurer.” It was reasonable for the Land Bank to presume from Aron Margosian’s officer titles that he was familiar with ZM’s financial statements and, by extension, its financial dependence on Z & S’s operating line of credit. At a minimum, the Land Bank was entitled to presume that Aron Margosian had the “ability to obtain knowledge of such facts independently in the exercise of ordinary care.” Restatement (Third) of Suretyship & Guaranty § 12(4)(c). Indeed, from the Land Bank’s perspective, ZM’s Treasurer/CFO was in a better position than the Bank’s loan officers to understand the company’s financial position.
The written correspondence between the Land Bank and the Margosians also provided no reason for the Bank to think they were unfamiliar with ZM’s finances before guaranteeing the restructured loan. The Land Bank advised the Margosians in July 2008 that ZM’s original loans were or may be distressed and informed Aron Margo- *572 sian that ZM’s verbal request for a new loan was rejected because of concerns about the company’s finances. The Mar-gosians then signed an “Application for Restructure” in early August 2008 “acknowledge[ing] and consenting] to their continued liability for this loan.” This sequence of events suggests that the Margo-sians understood the. distressed status of ZM’s existing loans and accepted the Land Bank’s refinancing proposal to avoid default. In other words, from the Land Bank’s perspective, the Margosians were apparently informed rather than ignorant about the underlying reality concerning ZM’s finances.
Although the Margosians revealed themselves to be unsophisticated in certain respects when they signed the guaranty, their questions to Hugger stopped short of giving her reason to believe they were unaware of ZM’s finances or the 'status of its existing loans. Moreover, neither Frudden nor Hugger was required to “take any particular steps to ascertain whether the [Margosians were actually] acquainted with facts that the [Bank] may reasonably [have] believefd] [were] known to both of them.” Restatement (Third) of Suretyship & Guaranty § 12(3) cmt. f.
In sum, no reasonable judge or jury could find that the Land Bank had reason to believe that the Margosians were unaware of ZM’s precarious finances before they guaranteed its $4.8 million restructured loan. It follows that the Land Bank was entitled to summary judgment on the Margosians’ fraudulent concealment claim.
3. In dicta, the district court opined that the Land Bank is statutorily immune from punitive damages because it is a “federal agency” under the Federal Tort Claims Act. See 28 U.S.C. § 2671. Over thirty years ago, this Court held that a federally chartered institution like the Land Bank with a “sue and be sued” clause in its enabling legislation, see 12 U.S.C. § 2093(4), cannot be sued for punitive damages unless Congress expressly waives its statutory immunity. See In re Sparkman, 703 F.2d 1097, 1101 (9th Cir.1983). On appeal, the Margosians argue that Sparkman is no longer good law. See McGee v. Tucoemas Fed. Credit Union, 153 Cal.App.4th 1351, 1359, 63 Cal.Rptr.3d 808 (2007) (noting that “the Sparkman analysis is inconsistent” with the Supreme Court’s “contrary analytical framework in FDIC v. Meyer” 510 U.S. 471, 480, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). The district court should consider this argument in the first instance on remand.
REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.

 This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

. The Margosians recognize that justifiable reliance is a common element in all of their cross claims against the Land Bank except the fraudulent concealment claim addressed infra at § 2. See Appellant’s Reply Br. at 12.

. In connection with ZM's restructured loan, Aron Margosian also signed (1) a twelve—page "Loan Agreement"; (2) an eight-page "Installment Promissory Note”; (3) a twenty-one page "Deed of Trust”; and (4) a six-page "Security Agreement.” It is not clear from the record whether Aron ®Margosian signed these documents when Hugger and Frudden made an unexpected visit to his home or on another occasion.