Filed 3/12/14

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| D'ARRIGO BROS. OF CALIFORNIA, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> UNITED FARMWORKERS OF AMERICA, <br><br> Defendant and Appellant. | H038213 <br> (Monterey County <br> Super. Ct. No. M112896) |


D'Arrigo Bros. of California (D'Arrigo) filed this action for breach of contract against the United Farmworkers of America (UFW), which was representing D'Arrigo's agricultural workers.  UFW moved to strike D'Arrigo's complaint under the anti-SLAPP statute, Code of Civil Procedure section 425.16 ("section 425.16"), but the superior court denied the motion.  UFW seeks review, contending that the action arose from its protected petitioning activity and that D'Arrigo cannot show a probability of prevailing in the action.  We find merit in UFW's position and therefore must reverse the order.

*Background*

Defendant UFW is a labor organization within the meaning of the Agricultural Labor Relations Act (ALRA), Labor Code sections 1140, et seq.  UFW has been the union representative of D'Arrigo's agricultural employees in the Salinas Valley since the union was certified (over D'Arrigo's opposition) in 1977.  Since that time the parties have

1

had repeated disputes over D'Arrigo's collective bargaining obligations and UFW's allegations of unfair labor practices (ULPs).[1]

On October 28, 2010, UFW filed a charge of ULPs with the Agricultural Labor Relations Board (ALRB), which was designated ALRB case number 2010-CE-050-SAL. In that charge UFW alleged that D'Arrigo had "initiated a de[c]ertification campaign against the [UFW]."

On November 8, 2010, UFW filed a second ULP charge (2010-CE-052-SAL) alleging that D'Arrigo had promised its employees "benefits and improved working conditions" if they "voted out" UFW as its union representative. After the election on November 17, UFW filed objections on nine grounds and asked the ALRB to set aside the election (Case No. 2010-RD-4-SAL).[2] Objection No. 5 accused D'Arrigo management of promising that it would maintain existing benefits to workers and would not replace them with labor contractor employees, although it had resisted UFW's proposals to improve wages and other benefits and had proposed eliminating certain employment protections. UFW protested that D'Arrigo's promises to existing workers "constituted an unlawful promise designed to undermine the Union's majority support and bargaining status and to thereby cause disaffection among the workforce."

On February 11, 2011, however, UFW's counsel requested dismissal of both Objection No. 5 and the second ULP charge. The latter request was granted on February 14. Shortly thereafter, the parties reached an understanding with respect to both

---

[1] This court has granted multiple requests for judicial notice of proceedings before the ALRB. A ruling on an additional request, pertaining to 39 ALRB No. 4, was deferred on May 10, 2013, and is now granted only as to the existence of the decision. In addition, we take judicial notice on our own motion of the existence of decisions rendered in 4 ALRB No. 45, 6 ALRB No. 27, 8 ALRB No. 45, and 8 ALRB No. 66.

[2] According to UFW, "the ballots were not counted but were impounded by the ALRB until the ULP charges could be resolved."

2

the objection and the dismissed charge. On February 18, 2011, UFW's attorney sent D'Arrigo's counsel a letter purporting to "memorialize the UFW's agreement." In the letter UFW acknowledged that it had obtained dismissal of the second ULP, and it promised not to refile this charge "and/or the substantive allegations at a later date."

The letter also noted that UFW had requested dismissal of Objection No. 5 regarding the unlawful promise of benefits. As of that time, however, "The Executive Secretary has not yet ruled on this request. UFW therefore agrees that said Objection Five will in fact be dismissed in its entirety or that, in the event the Executive Secretary for any reason declines to dismiss all or any of it prior to a hearing, UFW will timely act to withdraw its declarations and argument regarding Objection Five and will not present any evidence thereon in the objection process; and will continue to advise (in writing, on the record) the Executive Secretary, General Counsel, and/or assigned administrative law judge that UFW wants Objection Five entirely dismissed; and that UFW will not pursue, nor assist [in] pursuing, Objection Five in any fashion whatsoever."

On February 24, 2011, the General Counsel for the ALRB, having investigated the *first* (October 28, 2010) ULP charge (2010-CE-050-SAL), issued a complaint describing the following conduct. On October 27, 2010, a worker asked crew members to sign a petition to decertify UFW as its union representative, "in full view of and listening distance of forelady Alma Cordoba who allowed this activity to take place and to continue." The worker stated that "he was there on behalf of [D'Arrigo's] management representatives because they did not want the Union, an assertion that was not denied by forelady Cordoba." After reviewing the signatures and requesting some workers to make corrections, Cordoba allowed the worker to gather more signatures on the petition. Between October 27 and November 3, 2010, several other supervisors allowed workers to solicit signatures in their presence and with management approval. Thus, through its supervisory employees, D'Arrigo had "initiated, participated in, aided, and/or given

3

support to a decertification campaign against the Union, the certified bargaining representative of its employees."

In the course of the ensuing hearing on the decertification challenge (2010-RD-4-SAL and 2010-CE-050-SAL),[3] the parties stipulated that UFW had withdrawn Objection No. 5. They continued, however, to debate the question of whether the " 'promise of benefits' " evidence should be admitted. D'Arrigo contended that to bring in such evidence in this proceeding would be "tantamount to permitting the General Counsel to litigate an unfair labor practice that is barred," both by the stipulation and by the statute of limitations for re-filing the dismissed ULP charge (2010-CE-52-SAL). The deputy General Counsel, Marvin J. Brenner, maintained, however, that he was not bound by the stipulation between D'Arrigo and UFW, and therefore he should be permitted to introduce evidence that D'Arrigo promised workers that if they "kicked out" the union, their wages and benefits would stay the same.

Mark R. Soble, the Administrative Law Judge (ALJ), ruled that the stipulation between D'Arrigo and UFW did not bar the General Counsel from presenting the evidence. Judge Soble declined to "ignore something that significant in trying to assess whether there was an environment which could have caused employees to think that the company had a particular position or other circumstances related to the petition signing-process [*sic*] or the election itself . . . [T]hat would be just – for lack of a better way to put it, bizarre to ignore something that crucial in trying to analyze the totality of the circumstances." A contrary ruling, Judge Soble opined, would be "inconsistent with the purpose of the [ALRA]."

---

[3] The objections and the first charge were apparently heard together. D'Arrigo represents that the two proceedings were consolidated, though it cites nothing in the record except written argument it had cited to the ALRB in challenging the unfavorable outcome of the hearing.

D'Arrigo requested permission from the ALRB to appeal the "promise of benefits" evidentiary ruling. The Board denied the application, noting, "No where [*sic*] in the transcript excerpts provided by D'Arrigo does the ALJ indicate that he intends to allow the General Counsel to seek to establish any violation not contained in the complaint. Nor does the ALJ state that he intends to allow the UFW to violate the stipulation noted above. Rather, the transcript reflects only that the ALJ declined to preclude the General Counsel from introducing evidence of the promise of benefits to the extent it is relevant to the allegations that are contained in the complaint. In other words, we do not view the ALJ's ruling as allowing the introduction of evidence of the promise of benefits to establish an independent unfair labor practice not alleged in the complaint or to establish an independent basis for setting aside the election."

On June 23, 2011, before receiving the ALRB's rejection of its appeal, D'Arrigo brought this suit against UFW, alleging one cause of action for breach of contract. In the complaint D'Arrigo alleged that UFW had breached its promises in the parties' agreement by "pursuing, and assisting the ALRB general counsel in pursuing[,] allegations that D'Arrigo had unlawfully promised benefits to employees." D'Arrigo attached "a true copy" of the agreement.

UFW moved to strike the complaint under section 425.16. UFW asserted that D'Arrigo's claim arose from its constitutionally protected petitioning activities before the ALRB and that D'Arrigo would not be able to establish a probability of prevailing. After hearing argument on the motion, the superior court denied the motion in a minute order. This appeal followed.

*Discussion*

*1. Scope and Standard of Review*

Both parties appear to understand the nature of section 425.16 and the legislative intent underlying its enactment. "A SLAPP is a civil lawsuit that is aimed at preventing

5

citizens from exercising their political rights or punishing those who have done so. ' "While SLAPP suits masquerade as ordinary lawsuits such as defamation and interference with prospective economic advantage, they are generally meritless suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right." ' " (*Simpson Strong-Tie Company, Inc. v. Gore* (2010) 49 Cal.4th 12, 21; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1126.) Section 425.16 was enacted in 1992 to address the "disturbing increase" in the frequency of these meritless harassing lawsuits. (§ 425.16, subd. (a); see *Navellier v. Sletten* (2002) 29 Cal.4th 82, 85, fn. 1; *Simpson Strong-Tie Company, Inc. v. Gore*, *supra*, 49 Cal.4th at p. 21.) It was the Legislature's finding "that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly." (§ 425.16, subd. (a).) The statute was thus designed to deter meritless actions that "deplete 'the defendant's energy' and drain 'his or her resources,' [citation], . . . ' ". . . by ending them early and without great cost to the SLAPP target" ' [citation]." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192; *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278; *Chabak v. Monroy* (2007) 154 Cal.App.4th 1502.) The challenged cause of action may appear in a complaint, in a cross-complaint, or in other pleadings. (§ 425.16, subd. (h); *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 77 (*Cotati*).)

In evaluating a motion under the statute the trial court engages in a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Cotati*,

6

*supra*, 29 Cal.4th at p. 76; *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819-820.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute— i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 89.) We review an order granting or denying a motion to strike under section 425.16 de novo. (*Soukup v. Law Offices of Herbert Hafif, supra,* 39 Cal.4th at p. 269, fn. 3; *Oasis West Realty, LLC v. Goldman, supra,* 51 Cal.4th at p. 820.)

2. *The "Arising From" Prong*

The first step of the section 425.16 analysis is to determine whether the challenged cause of action is one "arising from" protected activity. It is the burden of the party seeking the protection of the statute, UFW in this case, to show that the challenged cause of action falls within the statute. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66 (*Equilon*); accord, *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733.) Accordingly, the conduct at issue must fall within one of the four categories set forth in subdivision (e) of section 425.16: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

The superior court expressed uncertainty as to whether UFW had satisfied the first prong of the statutory test. We bear no such uncertainty. We recognize that "the 'arising from' requirement is not always easily met." (*Equilon, supra,* 29 Cal.4th at p. 66.)

7

"[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute. [Citation.] Moreover, that a cause of action arguably may have been 'triggered' by protected activity does not entail [*sic*] that it is one arising from such. [Citation.] In the anti-SLAPP context, the critical consideration is whether the cause of action is *based* on the defendant's protected free speech or petitioning activity." (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 89; *In re Episcopal Church Cases* (2009) 45 Cal.4th 467, 477.) Moreover, "a defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant. . . . [W]hen the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute." (*Martinez v. Metabolife Intern., Inc.* (2003) 113 Cal.App.4th 181, 188.)

Notably, however, in *Navellier, supra,* 29 Cal.4th 82, the Supreme Court made it clear that the "arising from" prong of the anti-SLAPP statute may encompass a cause of action for breach of contract arising from the moving party's claim for relief filed in federal district court; such a claim "indisputably is a 'statement or writing made before a . . . judicial proceeding' (§ 425.16, subd. (e)(1))." (*Id.* at p. 90.) Here it is clear that at a minimum, D'Arrigo's claim arises from (is based on) UFW's acts of "pursuing, and assisting the ALRB general counsel in pursuing[,] allegations that D'Arrigo had unlawfully promised benefits to its employees." This alleged conduct unquestionably constituted statements made in connection with an issue under consideration by the ALRB in an official adjudicatory proceeding authorized by the ALRA. UFW thus met its burden to show that D'Arrigo's cause of action is one "arising from" protected activity.

8

*3. Probability of Prevailing*

To satisfy the second prong of the SLAPP analysis, " 'a plaintiff responding to an anti-SLAPP motion must " 'state[ ] and substantiate[ ] a legally sufficient claim.' " [Citations.]  Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." '  [Citation.] 'We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." (§ 425.16, subd. (b)(2).)  However, we neither "weigh credibility, [nor] compare the weight of the evidence.  Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." ' [Citation.]  If the plaintiff 'can show a probability of prevailing on any part of its claim, the cause of action is not meritless' and will not be stricken; 'once a plaintiff shows a probability of prevailing *on any part of its claim*, the plaintiff *has established* that its cause of action has some merit and the entire cause of action stands.'  [Citation.]" (*Oasis West Realty, LLC v. Goldman, supra,* 51 Cal.4th at p. 820.)

Here the sole cause of action was for breach of contract.  Establishing that claim requires a showing of "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Id*. at p. 821, citing *Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 830.)

In its complaint D'Arrigo asserted that the breach occurred "by pursuing, and assisting the ALRB general counsel in pursuing[,] allegations that D'Arrigo had unlawfully promised benefits to employees."  On appeal, D'Arrigo adds that UFW failed to withdraw declarations supporting the objection, voluntarily met with and submitted

9

declarations to the deputy General Counsel in preparation for the hearing, and allowed its own attorneys to cross-examine witnesses on the allegations.[4]

In its anti-SLAPP motion UFW advanced several points: (1) UFW never promised not to help the General Counsel pursue an independent action, but only agreed to withdraw the second ULP charge (and not refile it) and not to pursue Objection No. 5; (2) the promise not to "assist [in] pursuing" Objection No. 5 was to come into play only if the Executive Secretary "declines to dismiss all or any of it," and that dismissal in effect did occur when UFW refrained from pursuing it at the hearing before the ALJ; (3) even if UFW obligated itself not to assist the General Counsel, any such promise would be unenforceable as against public policy; and (4) the claim was preempted by the ALRB's primary jurisdiction.

Toward the end of the hearing on its anti-SLAPP motion UFW also asserted that D'Arrigo had not proffered evidence for every element— namely, damages and "consideration for the agreement, the so called agreement . . . ." Other than that brief mention of consideration, UFW did not pursue the absence of this element as a bar to D'Arrigo's recovery for breach of contract and proceeded as if a contract actually existed. However, the document D'Arrigo represented to be the parties' contract contains no provision indicating that UFW received any consideration for its promises. Inexplicably, on appeal UFW does not argue or even suggest this basic point, which would defeat any breach-of-contract claim. (Civ. Code, § 1550.) For purposes of this appeal, however, we

---

[4] This factual assertion is not supported by any citations to the record. At most D'Arrigo describes instances in which UFW's attorney objected to certain questions going to "protected concerted activity." At one point UFW's attorney withdrew an objection to a question about whether the union had told employees that the company would take away certain employee benefits if the union "was out." Counsel apologized and acknowledged that he had forgotten that "this is an area that I'm not . . . involved with." (*Id*. p. 1837.)

will assume that UFW has some undisclosed reason for not discussing the absence of this critical element and proceed to address other issues material to the dispute.

One of those material issues is whether any breach actually occurred.[5] UFW contends that there was no breach, because the Union never assumed an obligation not to help the General Counsel investigate or prosecute ULPs. Instead, the UFW promised (1) not to refile the second ULP charge or its "substantive allegations"; and (2) to obtain dismissal of Objection No. 5-- or, *if* the Executive Secretary declined to dismiss it, then to withdraw all of its supporting evidence, continue to pursue dismissal, and refrain from pursuing the objection "in any fashion whatsoever."

UFW maintains that it acted in accordance with those promises by (1) not refiling the second charge or its substantive allegations; and (2) withdrawing Objection No. 5. D'Arrigo responds to the first argument by pointing out that UFW assisted Brenner, the deputy General Counsel, in pursuing the *substantive allegations* of the second, dismissed charge (2010-CE-052-SAL), which related to promises of benefits, using evidence submitted in connection with Objection No. 5. D'Arrigo also contends that UFW breached its obligation not to pursue Objection No. 5 itself, by sharing worker and witness declarations with the General Counsel and providing hearing testimony bearing on the "promises of benefits" issue. In D'Arrigo's view, this "blatant" assistance was a

_____

[5] D'Arrigo contends that this issue is outside the scope of UFW's appeal because it calls for interpretation of the contract language, which should have been raised by demurrer. In this proceeding, D'Arrigo argues, UFW is attempting to obtain review of an interlocutory order, which violates the "one final judgment rule." We disagree. Whether D'Arrigo can prevail depends on whether it can show that a breach occurred. Establishing that element would in turn depend on the meaning of the contract language—specifically, what UFW promised to do. The determination of this issue is not beyond this court's "authority" to address.

11

breach of UFW's promise not to pursue the objection "in any fashion."[6] In D'Arrigo's view, by thus assisting the deputy General Counsel in his efforts to show that D'Arrigo had allegedly engaged in unlawful promises of benefits, UFW violated "almost every aspect" of the obligations set forth in the second paragraph of the February 18, 2011 letter.

We cannot agree with D'Arrigo that UFW can be said to have breached its promise in the first paragraph of the "agreement," because it did not *refile* either the second charge or the substantive allegations of that charge. As for the second paragraph relating to Objection No. 5, the promise not to "assist [in] pursuing" this objection appears to have been predicated on the Executive Secretary's declining to dismiss the objection. If dismissal did not occur, then UFW was to withdraw all of its supporting evidence, stop pursuing the objection, and continue to request dismissal. Thus, the reference to "pursuing," like the other promised acts in this paragraph, clearly assumes an extant Objection No. 5.

Adhering to a literal interpretation of the paragraph language, UFW argues that the contingent language never became operative, because the Executive Secretary did not affirmatively *refuse* to dismiss the objection, and the objection was withdrawn anyway by stipulation of all parties.[7] D'Arrigo, however, argues that the Executive Secretary did, in

---

[6] D'Arrigo also points to a declaration by a UFW vice president stating that he had complied with the General Counsel's instruction to bring certain documents to the administrative hearing before Judge Soble. Those documents consisted of collective bargaining proposals exchanged by the parties during contract negotiations and, according to the declarant, did not concern any promises of benefits. Nevertheless, D'Arrigo insists that absent any subpoena, the proposals should not have been produced, and that the vice president should not have met with the General Counsel before and during his hearing testimony.

[7] The parties agreed at the ALRB prehearing conference that Objection No. 5 would be dismissed and that evidence would not be presented on the objection in the proceeding. At the administrative hearing before Judge Soble, D'Arrigo argued that "for legal

effect, decline to dismiss the objection by not deeming it dismissed and by setting it for hearing. If that factual premise is accepted, then UFW can be said to have breached its promise not to "assist" in pursuing Objection No. 5 "in any fashion whatsoever." UFW responds that D'Arrigo's timing is off; the objection was pending in April 2011 when the matter was set for hearing, but by the time the June 13 hearing began, the objection had already been "dismissed" at the May 26 prehearing conference.

We need not resolve the parties' debate over whether Objection No. 5 was, in effect, dismissed by its withdrawal at the prehearing conference, thereby eliminating the condition of UFW's promise not to pursue the objection "in any fashion whatsoever." It is undisputed that the deputy General Counsel was litigating the first ULP charge-- which had not been dismissed or withdrawn by UFW-- and that he relied on the evidence of those promises to establish that D'Arrigo had "initiated, participated in, aided, and/or given support to" the decertification campaign against UFW. We cannot construe the "agreement" to preclude Brenner's "promises of benefits" evidence, which Judge Soble considered "crucial" in his analysis of the totality of the circumstances. Moreover, we agree with UFW—and with the General Counsel as amicus curiae-- that any interpretation of the stipulated language to prohibit UFW from cooperating with Brenner in his investigation and prosecution of the first ULP charge must be rejected as contrary to the public policy inherent in the ALRA.

The General Counsel is given full authority under the ALRA to investigate charges, issue complaints, and prosecute complaints before the Board. (Lab. Code, § 1149.) The Act requires access by the Board (and thus by the General Counsel) to "any evidence of any person being investigated or proceeded against that relates to any matter

---

purposes," "objections that had been stipulated to be withdrawn and dismissed by the Union . . . no longer exist." Nevertheless, by the time of the hearing the General Counsel had in its possession declarations that had been submitted in support of Objection No. 5 and were obtained from the "objections file."

13

under investigation or in question." (Lab. Code, § 1151.) The General Counsel is further authorized to "administer oaths and affirmations, examine witnesses, and receive evidence. Such attendance of witnesses and the production of such evidence may be required from any place in the state at any designated place of hearing." (*Ibid*.)

As the General Counsel points out in her amicus brief, "Without the cooperation and assistance of percipient witnesses, the General Counsel will be unable to determine whether sufficient facts exist to warrant the issuance of a complaint and will be powerless to protect the rights of agricultural employees established by the ALRA. If found valid, private agreements not to cooperate will likely deter witnesses from sharing information with the General Counsel due to fear of litigation and could provide an excuse not to assist the General Counsel. Moreover, the [employer's] ability to guarantee the silence of witnesses by means of a legally enforceable private agreement does not comport with either the spirit or the stated purpose of the ALRA."

That purpose is clearly stated in Labor Code section 1140.2: "[T]o encourage and protect the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing, to negotiate the terms and conditions of their employment, and to be free from the interference, restraint, or coercion of employers . . . ." This public interest is not advanced if private agreements between employer and employee are allowed to obstruct the General Counsel's prosecution of complaints. (Cf. *E.E.O.C. v. Astra U.S.A., Inc.* (1st Cir. 1996) 94 F.3d 738, 744-745 [settlement provision prohibiting employee from assisting EEOC in its investigation of sexual harassment charges against employer is void as against public policy].)

The General Counsel also raises practical considerations, observing, "If parties were free to agree to withhold necessary information concerning unlawful employment practices, the General Counsel would have to resort to a much more frequent use of its

14

subpoena powers to force these witnesses to testify and would incur the additional burden of having to seek enforcement of the subpoena in superior court. (Lab. Code, § 1151, subd. (a).) The General Counsel should not be forced to expend its already-limited resources in this manner, particularly because use of the subpoena power is not an effective solution and 'would not only stultify investigations but also significantly increase the time and expense of a probe.' (*EEOC v. Astra U.S.A., Inc., supra*, 94 F.3d at p. 745.) The subpoena power is not a sufficient alternative due to the mobile nature of the agricultural industry. As the Court explained in *Agric. Labor Relations Bd. v. Superior Court* (1976) 16 Ca1.3d 392: [¶] [']many farmworkers are migrants; they arrive in town in time for the local harvest, live in motels, labor camps, or with friends or relatives, then move on when the crop is in . . . [E]ven those farmworkers who are relatively sedentary often live in widely spread settlements, thus making personal contact at home impractical because it is both time-consuming and expensive.['] [¶] (*Id.* at pp. 414-417.) Even during the work season, agricultural workers typically move from one field to another as part of their daily jobs, which makes it even more difficult to locate workers from one day to the next. Given the time and expense required to serve and enforce subpoenas and the difficulty in locating percipient witnesses, resort to the use of the ALRB's subpoena will only delay and obstruct the General Counsel's prosecution of unfair labor practices. Moreover, the stated policy of the ALRA demands that witnesses feel free to come forward of their own volition, and not only after issuance and judicial enforcement of a subpoena."

We find the General Counsel's position convincing and adopt her reasoning. *EEOC v. Astra*, *supra*, 94 F.3d 738 (*Astra*), cited by the General Counsel, presented an analogous situation; and the investigation in that case did not suffer from the added constraint of mobile employees. In *Astra* the defendant employer, responding to sexual harassment claims, entered into settlement agreements with past and current employees in

which the employees agreed that they would not file sexual harassment charges with the Equal Opportunity Commission (EEOC) and would not assist either other employees or the EEOC in filing such charges. The employer unsuccessfully argued that employees could still provide information to the EEOC by subpoena;[8] but the appellate court observed that the agreements appeared to bar the employees from volunteering information in, or otherwise cooperating with, the EEOC's investigation of discrimination charges. The court noted that "if victims of or witnesses to sexual harassment are unable to approach the EEOC or even to answer its questions, the investigatory powers that Congress conferred would be sharply curtailed and the efficacy of investigations would be severely hampered." (*Id*. at p. 744.) Accordingly, the portion of the settlement prohibiting cooperation with the EEOC was invalidated as against public policy, because such "stipulations . . . could effectively thwart an agency investigation. . . . [A]ny agreement that materially interferes with communication between an employee and the Commission sows the seeds of harm to the public interest." (*Ibid*.; see also *E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div.* (5th Cir. 1987) 821 F.2d 1085, 1090 [waiver of the right to file a charge with the EEOC is void as against public policy, though employee may waive recovery in employee's own lawsuit or suit brought by EEOC on employee's behalf].)

---

[8] The *Astra* court soundly dismissed this suggestion, reasoning that it "boils down to a contention that employees who have signed settlement agreements should speak only when spoken to. We reject such a repressive construct. It would be most peculiar to insist that the EEOC resort to its subpoena power when public policy so clearly favors the free flow of information between victims of harassment and the agency entrusted with righting the wrongs inflicted upon them. Such a protocol would not only stultify investigations but also significantly increase the time and expense of a probe." (*Astra*, *supra*, 94 F.3d at p. 745.) This reasoning is apt in the case before us, where D'Arrigo takes UFW to task for providing documents to, and meeting with, the General Counsel without a subpoena.

16

Also instructive is *Cariveau v. Halferty* (2000) 83 Cal.App.4th 126, 136-137, where the appellate court upheld the superior court's refusal to enforce a confidentiality clause in a release that prohibited a client from disclosing her investment adviser's misconduct to anyone, including regulatory agencies. The agreement thus permitted concealment of violations of public policy, regulatory rules, and securities laws protecting the public interest. The court held that the confidentiality clause amounted to "an agreement to silence wrongdoing," which would "undermine the public's confidence in the integrity of securities oversight," leave investors unprotected, and encourage future violators to "hide their misdeeds in a secret agreement free from the light of regulatory scrutiny." (*Id.* at p. 137.)

The parties debate the significance of *Agricultural Labor Relations Bd. v. Richard A. Glass Co.* (1985) 175 Cal.App.3d 703, 716, where the ALRB appealed from an order denying its application for enforcement of subpoenas duces tecum. The ALRB was seeking information in its litigation of a ULP complaint against a grower of citrus crops. After rejecting the employer's assertion of waiver by the UFW, which represented the company's agricultural workers, the appellate court held that even if the union had contractually waived its right to the information sought, such a waiver would not affect the ALRB's right to that information. The ALRB, the court explained, "is for the vindication of public, not private, rights. [Citation.] Because the continued economic health of agricultural workers in this state is of public importance, any agreement between the UFW and [the employer] to restrict the evidence the ALRB may receive in protecting an agricultural worker's interest is void as against public policy." (*Ibid.*)

In this case, it makes no difference that the claimed assistance was obtained in part through witnesses' voluntary cooperation without a subpoena. The underlying principle is the same: to interfere with the duty of the ALRB and its General Counsel under the ALRA would be contrary to the public interest in protecting the right of agricultural

17

employees to designate their own representatives and negotiate the terms of their employment. (Lab. Code, § 1140.2.)

We thus conclude that D'Arrigo is unable to demonstrate a probability of prevailing on its breach of contract claim. Even if its February 18, 2011 letter is assumed to be a contract supported by the element of consideration, UFW had no obligation, either under the terms of the contract or as a matter of public policy, not to cooperate in the General Counsel's independent investigation and prosecution of the ULP complaint. In light of this conclusion, it is unnecessary to address UFW's assertion that D'Arrigo failed to present admissible evidence of damages, or its argument that D'Arrigo's claim is preempted by the primary jurisdiction of the ALRB.

*Disposition*

The order is reversed. Upon remand, the superior court is directed to grant UFW's motion under section 425.16. UFW is entitled to its costs on appeal.


_____

ELIA, Acting P. J.


WE CONCUR:


_____

MIHARA, J.


_____

GROVER, J.

18

| | |
|---|---|
| Trial Court: | Monterey County Superior Court |
| Trial Judge: | Hon. Lydia M. Villarreal |
| Attorneys for Appellant: | Altshuler Berzon and<br>Jeffrey B. Demain and<br>Scott A. Kronland |
| | Mario Martinez and<br>Thomas P. Lynch |
| Amicus Curiae in support<br> Of Appellant: | Sylvia Torres Guillen,<br>General Counsel,<br>Agricultural Labor Relations Board |
| Attorneys for Respondent: | Cook Brown and<br>Geoffrey F. Gega,<br>Regina Silva and<br>Matthew B. Golper |

*D'Arrigo Bros. etc. v. United Farmworkers of America*

H038213