Filed 11/30/23  Scenic Enterprise v. SFI McCabe CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| SCENIC ENTERPRISE, LLC et al., | |
| Plaintiffs and Appellants, | G061884 |
| v. | (Super. Ct. No. 30-2020-01163838) |
| SFI McCABE, LLC et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Glenn R. Salter, Judge.  Affirmed.

Watt, Tieder, Hoffar & Fitzgerald, Jane G. Kearl and Colin C. Holley for Plaintiffs and Appellants.

Fingal, Fahrney & Clark and Christopher R. Clark for Defendants and Appellants.

MLink Enterprise, LLC signed a contract to purchase two commercial buildings from SFI McCabe, LLC (the Agreement).  Before completing the transaction, MLink assigned its rights under the contract to two other companies, Scenic Enterprise, LLC and McCabe Group, LLC, and those companies proceeded to take ownership of the properties.[1]

Buyers later sued SFI and related entities (collectively, SFI), alleging SFI had concealed the condition of the subsoil of the properties' parking lot, which was excessively moist, and misrepresented two telecom leases burdening one of the buildings as if they were no longer in effect.  In the operative complaint, MLink asserted claims for fraudulent concealment and intentional and negligent misrepresentation, and all Buyers asserted claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

Following a jury trial, the jury generally found for Buyers on the telecom-related claims but for SFI on the parking lot claims.  SFI moved for judgment notwithstanding the verdict (JNOV) on the telecom claims, which the trial court granted. The court concluded, inter alia, that the evidence supported neither a finding of a misrepresentation by SFI nor a finding of justifiable reliance by MLink.

On appeal, Buyers challenge both the trial court's JNOV, arguing the evidence sufficiently supported the verdict as to the telecom claims, and the jury's verdict, arguing the evidence compelled the jury to find for Buyers on the parking lot claims.  As explained below, we conclude the court correctly granted JNOV on the telecom claims because:  (1) for purposes of the relevant causes of action in tort, there was no evidence that MLink had suffered damages because of SFI's alleged misrepresentations, as MLink had not taken ownership of the properties; and (2) under the Agreement, Buyers had waived any contract-based claims by choosing to complete

---

[1]       We refer to MLink, Scenic, and McCabe Group collectively as Buyers.

the transaction after discovering the alleged misrepresentations. We also conclude the evidence did not compel a verdict for Buyers on the parking lot claims. Accordingly, we affirm.[2]

FACTS

I. *SFI's Purchase of the Property and the Telecom Leases*

In 2015, SFI purchased a property in Irvine containing three commercial buildings (units 1-3). At the time of the purchase, unit 2 was subject to two telecom leases, pursuant to which active telecom antennas and other telecom equipment had been placed on the roof of that building. Those leases were signed in 2000 and 2006, respectively. Each had an initial term of five years, with automatic five-year renewal periods, subject to the telecom companies' right to terminate the leases. The earlier-signed lease had five automatic renewal terms and the other had four.

In 2018, SFI sold unit 3 to a third party and, as part of the sale, assigned the telecom leases to that buyer. SFI also granted the buyer an exclusive easement for the portions of the roof of unit 2 where the telecom antennas and equipment were located. The easement was to terminate upon the expiration of the leases. Ownership of the parking lot was given to a newly formed owners' association, whose membership comprised the three buildings' owners.

II. *The Parking Lot's Subsoil and the 2016 to 2017 Construction*

Before completing its purchase of the property, SFI obtained a property condition assessment report, prepared by the McDonnell Group (McDonnell report), and a "Phase I Environmental Site Assessment Report" (Phase I report). The Phase I report stated the property had a "Soil Surface Texture" of clay and the soil was classified as "Class D - Very slow infiltration rates." The McDonnell report surveyed conditions throughout the property. As to the parking lot common to all three buildings, the report

_____

[2] Given our affirmance of the judgment, we do not address SFI's protective cross-appeal challenging the jury's verdict for Buyers on the telecom claims.

3

noted there were "meandering cracks and sections of alligatoring . . . throughout the parking lot," as well as "low-lying areas and depressions," "several areas of surface wear and severe gravelling," and "standing water."[3]

In late 2016 and early 2017, SFI reconstructed a portion of the parking lot. Before beginning construction, SFI obtained a report from geotechnical engineering firm Terracon Consultants, Inc. (Terracon report). In discussing the parking lot area's underlying soil, the report stated: "At the time of our study, groundwater was encountered at 3 feet below ground surface. Based on the shallow depth of groundwater, some moisture conditioning of the on-site soils . . . will likely be needed for the project. The soils may need to be dried by aeration during dry weather conditions, or an additive . . . may be needed to stabilize the soil. If the construction schedule does not allow for scarifying and drying by aeration in place, the contractor may utilize dry crushed rock materials and geogrid . . . to stabilize wet subgrade materials."[4]

The 2016/2017 winter saw substantial rains. As work on the project was being performed, the contractor encountered significant moisture in the parking lot's subsoil and therefore sought and obtained approval to use geogrid and aggregate to stabilize the soil. The contractor was then able to complete the work in accordance with project plans.

III. *The Sale of Units 1 and 2 to Buyers*

A. *The Agreement*

On October 24, 2019, SFI and MLink—a company wholly owned by Tim Nguyen—signed the Agreement, under which MLink was to buy units 1 and 2 for

---

[3]     "Alligatoring" describes numerous cracks in the asphalt creating a spiderweb-like pattern.

[4]     The parties do not explain exactly what "geogrid" is, but at trial, SFI's counsel described it as "basically . . . [a] thin plastic mesh." Buyers' counsel did not object to that description.

4

$21 million. The Agreement required MLink to provide a nonrefundable deposit of $500,000 the next day, and another $250,000 if it decided to proceed with the transaction following a "Contingency Period."

The Agreement required SFI to make certain disclosures to MLink during the contingency period. Among other things, section 2.1 of the Agreement stated SFI was to "deliver or make available to Buyer at [SFI]'s offices or at the Real Property" various documents, including "reports and other items and materials related to the Property."

Under section 3.1 of the Agreement, SFI represented that all "Leases in force for the Property" were set forth in exhibit B to the Agreement. That exhibit, however, did not list the two telecom leases burdening unit 2.

The Agreement also addressed the possibility that during the contingency period, MLink would learn of an "Exception Matter," information rendering any of SFI's representations in the Agreement untrue. Section 3.2 of the Agreement permitted MLink to terminate the Agreement based on a "Material Exception Matter"—an exception matter that would cause MLink more than $50,000 in damage—if discovered before closing. Under that provision, if MLink terminated the Agreement based on a material exception matter, any deposits it had made would be returned. However, MLink's failure to notify SFI of a known exception matter within five business days would "be deemed a waiver" of that exception matter. Similarly, if MLink became aware of an exception matter before closing and chose to proceed with the purchase, SFI would "have no liability with respect to such Exception Matter."

B. *MLink's Receipt of Information About the Properties*

As part of SFI's disclosures, it provided MLink with an electronic link to various documents about the properties, including the McDonnell report, the Phase I report, and the declaration of covenants, conditions, and restrictions granting the telecom easement to the owner of unit 3. It did not include the Terracon report or the construction

5

file documenting the progress of the 2016/2017 parking lot reconstruction project. MLink also received a preliminary title report prepared by a title insurance company, noting the existence of the telecom leases, as disclosed by recorded memoranda of agreements.

On January 9, 2020, after the end of the contingency period, one of Buyers' agents went onto the roof of unit 2 as part of a walkthrough of the property. As the agent neared an "outline of cones," a building engineer stopped him and said, "'Don't get any closer. There [are] high-frequency cell towers there.'"

C. *MLink's Assignment of the Agreement, and Scenic and McCabe Group's Completion of the Transaction*

On January 13, 2020, MLink assigned its rights under the Agreement to two other companies owned by Nguyen, McCabe Group (which received the right to purchase unit 1) and Scenic (which received the right to purchase unit 2). Three days later, on January 16, an agent for Buyers asked SFI for additional information about the telecom leases. In response, SFI's attorney confirmed the leases were in force and set to expire in 2025 and 2026, but he maintained this was not relevant to Buyers because the owner of unit 3 owned these leases. The following week, McCabe Group and Scenic paid the remainder of the purchase price and, on January 22, completed the transaction. Neither company provided notice of any exception matter to SFI.

D. *The New Parking Lot Plans*

After Scenic and McCabe Group completed the purchase, they created plans to build a new parking lot, to include covered parking with solar panels, an entertainment area, and a sports court, among other new features. In connection with those plans, Scenic and McCabe Group contracted with geotechnical engineering company GMU to assess the condition of the parking lot and the underlying soil. After inspecting the lot and conducting tests, GMU reported the subgrade moisture level was "at least twice the optimum moisture content amount" and there was "high potential for

6

wet/soft/unstable subgrade to be encountered during construction." (Italics, boldface, and underscoring omitted.)

IV. *This Action*

A. *Buyers' Complaint*

In October 2020, Buyers filed this action against SFI. They asserted causes of action for fraudulent concealment of the telecom leases and the condition of the parking lot's subsoil, and intentional and negligent misrepresentation regarding the leases. They also asserted claims for breach of contract based on the telecom leases and breach of the implied covenant of good faith and fair dealing based on the leases and the parking lot's subsoil.

The trial court later partially sustained SFI's demurrer, ruling that Scenic and McCabe Group could not assert the concealment and misrepresentation causes of action because "there [we]re no allegations that the concealment or alleged misrepresentations were made to them or that they justifiably relied on them" and "according to the complaint, any alleged concealment or misrepresentations were apparently well known by all plaintiffs before the assignment [of the Agreement to those two companies] occurred." Buyers then filed a first amended complaint in which only MLink asserted the concealment and misrepresentation causes of action.

Shortly before the case proceeded to trial, SFI moved for judgment on the pleadings, arguing, inter alia, that MLink could not prove its concealment and misrepresentation causes of action because it had no damages: it had assigned its rights under the Agreement, "didn't . . . pay the consideration," and did not "carry any basis in the[] properties." After hearing arguments, the trial court denied the motion without prejudice.

B. *The Trial*

The matter proceeded to a lengthy trial, at which numerous witnesses testified. We recite only the testimony pertinent to this appeal.

7

1. *Testimony About the Telecom Leases*

SFI maintained that Buyers had received all necessary information about the telecom leases and had waived any breach of contract claim by failing to follow the Agreement's procedures for exception matters under section 3.2. Buyers' witnesses claimed SFI's failure to disclose the telecom leases as leases in force for the property led them to believe the leases had expired.

Nguyen, Buyers' owner, admitted that one of his agents had seen the telecom antennas on the roof of unit 2 before MLink signed the Agreement. He further admitted his team was aware of the easement in favor of unit 3's owner and of the preliminary title report identifying the leases. He testified, however, that because SFI had not disclosed the leases, he and his team believed the antennas were inactive and the leases were not in force. Nguyen and his team "trusted [SFI] to be honest" and provide the information they needed.

Adam Witt, an attorney who represented Buyers in the transaction, similarly testified that he assumed the leases had expired because he had not heard anything about them from SFI. He confirmed during cross-examination that Buyers did not notify SFI that the telecom leases were an exception matter under section 3.2 of the Agreement.

Regarding damages, Nguyen testified that at the time he negotiated the purchase price, it was his understanding that Scenic would have unfettered use of unit 2's roof. According to him, Scenic's inability to use most of the roof to generate revenue negatively impacted the value of unit 2, and the actual value of the property was the purchase price minus the lost future revenue. He stated that the lost revenue was the amount unit 3's owner was expected to receive under the telecom leases until their expiration, about $915,000.

2. *Testimony About the Parking Lot*

Buyers claimed SFI had concealed the parking lot subsoil's excessive-moisture problem, discovered during the 2016/2017 reconstruction project. SFI, on the other hand, maintained that it had complied with its disclosure obligations, that Buyers had received enough information to place them on notice of any excessive-moisture issue, and that any such issue was trivial.

Various witnesses who represented Buyers in the transaction testified they had no knowledge of the reports of excessive moisture in the soil from 2016/2017. However, on cross-examination, Nguyen testified his team had received the McDonnell report, which reported the deteriorated condition of the parking lot at the time. He acknowledged that "when it rains and there is irrigation runoff, the cracks . . . , graveling, [and] ponding of the parking lot causes water to seep through the asphalt." And he confirmed Buyers had also received the Phase I report, which showed the subsoil contained clay and had very slow infiltration rates for water.

Robert McDonnell, who had prepared the McDonnell report, testified he was unaware of the soil's saturation at the time of his report and would not have expected a layperson to deduct from a visual inspection of the parking lot that "there [was] excessive moisture" in the soil. At the time of his report, McDonnell was generally aware that much of the soil in Southern California and around Irvine had a heavy clay mix, but he did not investigate the soil at the property, as this was outside the scope of the report. And he confirmed that the Phase I report's description of the soil as clay, with very slow infiltration rates, indicated water penetrating the surface could be trapped.

Mark Chapman, Buyers' civil engineering expert, opined that Buyers' planned project would require significant work to prepare a new subgrade, including over-excavating and removing about 13 inches of the current subsoil and replacing it with rock material and geogrid. Chapman estimated the cost of the necessary soil-related work was about $660,000. However, on cross-examination, he confirmed the Terracon

9

report did not recommend a substantial over-excavation of the soil and the 2016/2017 reconstruction project did not employ that measure.

Stephen Blue, an SFI manager, testified that SFI had informed Buyers of the prior construction and that Buyers requested no additional information about it. He admitted on cross-examination that the McDonnell report had not alerted SFI to an issue with "supersaturated subsoil" in the parking lot area, but stated he did not believe there was an issue with the subsoil.

As to the Terracon report and the 2016/2017 construction file, Blue testified SFI had not provided them to Buyers because construction documents are typically not provided: "What is typical is a summary of the improvements that you did and approximate amounts, what you spent. And that is what we disclosed . . . . And then if buyers are interested in more information, . . . we make it available."

Allan Wallace, SFI's real estate expert, similarly testified that construction-related documents were typically not provided to a buyer in due diligence materials. Along the same lines, Randall Barkan, Buyers' real estate expert, testified that it was not unusual for a seller to avoid producing construction-related documents to the buyer because of their volume "and perhaps a layer of 'not considered to be the most pertinent' documents," but the seller would "let the other side know they are there and give them an opportunity to read them."

3. *The Jury's Verdict*

Answering a special verdict form, the jury generally found for Buyers on the telecom-related claims and for SFI on the parking lot claims. On the intentional and negligent misrepresentation causes of action, the jury found for MLink (the only plaintiff asserting those causes of action), concluding that SFI had misrepresented the status of the leases and MLink had reasonably relied on that misrepresentation. It awarded MLink about $915,000. The jury also found for Buyers on the cause of action for breach of the

10

implied covenant of good faith and fair dealing, providing the same damages determination.

On the other hand, the jury found for SFI on the fraudulent concealment cause of action. Dealing with the parking lot claims first, the jury found that (a) SFI knew about the condition of the subsoil and (b) did not disclose this information to MLink,[5] but (c) MLink either knew or could reasonably have discovered the information.[6] Second, as to the telecom leases, the jury found that SFI had disclosed to MLink that they were ongoing.[7] Finally, the jury also found for SFI on the breach of contract cause of action, concluding SFI did not fail to do something the Agreement required it to do.

C. *The JNOV*

After the jury rendered its verdict, SFI moved for JNOV, contending the evidence did not support the jury's findings on the telecom claims. It argued, inter alia, that: (1) the evidence did not support a finding of misrepresentation by SFI; (2) the evidence did not support a finding of reasonable reliance by MLink; (3) Buyers waived their claims by failing to provide notice of an exception matter under section 3.2 of the Agreement; and (4) MLink had no damages because it had assigned away its right to purchase unit 2, and it was Scenic that completed the transaction and owned that property.

---

[5]      We do not consider whether this finding was inconsistent with the jury's findings on the misrepresentation causes of action, as neither party raises this issue.

[6]      The special verdict form generally instructed the jury not to proceed to subsequent questions about the same claim when it answered any question adversely to Buyers. As to the fraudulent concealment cause of action, the form tracked CACI No. 1910 (real estate seller's nondisclosure of material facts), with which the jury was instructed.

[7]      The jury answered this question by a majority vote.

11

Following a hearing, the trial court granted SFI's motion. Among other things, it concluded the evidence did not support a finding of misrepresentation by SFI because the telecom equipment "was readily visible, [and] was shown on the original title report." The court added that "[a]lthough admittedly late in the negotiating process, [Buyers] conceded [SFI] advised them the telecom leases would be on-going after the sale."

The trial court later entered judgment for SFI. Buyers appealed, challenging both the court's JNOV on the telecom claims and the jury's verdict on the parking lot claims.

DISCUSSION

I. *The JNOV*

Buyers challenge the trial court's JNOV on the telecom claims, under the causes of action for intentional and negligent misrepresentation and breach of the implied covenant of good faith and fair dealing. They assert the jury's favorable verdict on those claims was sufficiently supported.

We review a JNOV de novo, applying the same standard used by the trial court. (*Linear Technology Corp. v. Tokyo Electron Ltd.* (2011) 200 Cal.App.4th 1527, 1532.) "'[W]e determine whether substantial evidence supported the verdict, viewing the evidence in the light most favorable to the party who obtained the verdict. [Citation.] We resolve all conflicts in the evidence and draw all reasonable inferences in favor of the verdict, and do not weigh the evidence or judge the credibility of witnesses. [Citations.]'" (*Ibid.*) We will affirm the court's judgment for SFI if it is correct on any ground. (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 278, fn. 5.)

As explained below, we conclude the trial court correctly granted JNOV on the telecom claims because: (1) for purposes of the misrepresentation causes of action, there was no evidence that MLink—the only plaintiff relevant to these causes of action— had suffered damages because of SFI's alleged misrepresentations; and (2) under the

12

Agreement, Scenic—the buyer of unit 2—had waived its contract-based claims by completing the purchase without providing notice of an exception matter.

A. *Intentional and Negligent Misrepresentation*

"The essential elements of a count for intentional misrepresentation are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage. [Citations.] The essential elements of a count for negligent misrepresentation are the same[,] except that it does not require knowledge of falsity but instead requires a misrepresentation of fact by a person who has no reasonable grounds for believing it to be true. [Citation.]" (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230-231 (*Chapman*).)

The evidence at trial did not support the jury's verdict for Buyers on the misrepresentation causes of action because MLink—the only plaintiff asserting these causes of action in the operative complaint—had suffered no damages. After signing the Agreement, MLink assigned its rights to the purchase of unit 2, rooftop antennas and all, to Scenic. Scenic completed the transaction and took ownership of the property. Thus, any reduction in unit 2's value due to the owner's inability to use its roof harmed Scenic alone, not MLink.

Although MLink and Scenic were affiliated companies, subject to common ownership and control, they were nevertheless different entities with a separate legal existence. (*Merco Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724, 729 [corporation is distinct legal entity separate from its stockholders and officers]; see also *Gantman v. United Pacific Ins. Co.* (1991) 232 Cal.App.3d 1560, 1566 [members of mutual benefit corporation lacked standing to sue on corporation's insurance policies].) Indeed, absent this separate existence, MLink's assignment of its contractual rights to Scenic would have had no point. Buyers point to no basis on which we could disregard

13

the corporate form of these distinct entities and attribute Scenic's alleged monetary loss to MLink.[8]

Although MLink paid $750,000 in nonrefundable deposits after signing the Agreement and before assigning its interests away, those deposits were part of the purchase price, which is not recoverable in an action for fraud in the purchase of property. (*Bowser v. Ford Motor Co.* (2022) 78 Cal.App.5th 587, 623 [out-of-pocket rule under Civ. Code, § 3343 precludes use of purchase price as measure of damages in actions for fraud in purchase of property].) MLink could have sought to rescind the Agreement and recover the amounts of the deposits after learning that unit 2's rooftop antennas were active, but it chose instead to assign its rights under the Agreement to Scenic, which completed the transaction. Having failed to prove it was harmed, MLink could not recover on its misrepresentation causes of action.[9] (*Chapman*, *supra*, 220 Cal.App.4th at pp. 230-231; *Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541, 1545

---

[8] Buyers cite cases holding that the assignor of a note for collateral security has standing to sue with the assignee's consent. (*Reidy v. Young* (1931) 119 Cal.App. 322, 324; *Mosier v. Suburban Estates, Inc., Ltd.* (1934) 137 Cal.App. 574, 576; *Mathis v. Shamoon* (1952) 114 Cal.App.2d Supp. 829, 830.) The question here, however, is not whether MLink has standing to assert a claim it has assigned to another party, but whether it can satisfy the elements of its own claim of misrepresentation.

[9] Buyers do not challenge the trial court's ruling that *Scenic* could not maintain a misrepresentation claim involving the telecom leases. Rightly so. By the time MLink assigned its right to purchase unit 2 to Scenic, on January 13, 2020, Scenic was aware that the rooftop antennas were active: days earlier, on January 9, a building engineer told Buyers' agent to stay away from the antennas because it was dangerous to get close to them. Buyers concede that after January 9, they understood the telecom leases "might still be ongoing." With knowledge that (1) a preliminary title report reflected telecom leases on the property, (2) the property was subject to a related easement, (3) there were telecom antennas on the roof, and (4) those antennas were *active*, Scenic could not justifiably rely on SFI's unsupported representation that there were no telecom leases in effect. (*Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1474 [plaintiff may not rely on representations that """"are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth"""].)

14

[nonsuit on misrepresentation claims affirmed because plaintiffs provided no evidence of qualifying damages].)

B. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Section 3.2 of the Agreement allowed Buyers to terminate the agreement based on a "Material Exception Matter" discovered before closing, in which case the otherwise nonrefundable deposit would be returned to them. It also provided, however, that Buyers' failure to notify SFI of a known exception matter within five business days would "be deemed a waiver" of that exception matter. Similarly, that provision stated that if Buyers became aware of an exception matter before closing and chose to proceed with the purchase of the property, SFI would "have no liability with respect to such Exception Matter." It is undisputed that Scenic, who had assumed MLink's rights and obligations under the Agreement as to unit 2, learned before closing that the telecom leases were ongoing. But rather than notify SFI of this claimed exception matter and seek recission, Scenic chose to complete the purchase of unit 2, thereby waiving any contractual claim against SFI, including a claim for breach of the implied covenant of good faith and fair dealing. (See *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1344 ["Breach of the covenant of good faith and fair dealing is nothing more than a cause of action for breach of contract"].)

Buyers contend they "had no reason to believe [SFI] would return [Buyers'] non-refundable deposits . . . under Section 3.2 of the Agreement if [Buyers] claimed the nondisclosure of the status of the leases was a Material Exception Matter." But whether SFI would have accepted Scenic's demand is irrelevant. The Agreement gave Scenic the right to rescind and receive the previously paid deposits, assuming a material exception matter, and provided that choosing to close despite a known exception

15

matter waived SFI's liability for that exception matter.[10]  Accordingly, Scenic could not recover on its claim for breach of the covenant of good faith and fair dealing.[11]

II. *The Jury's Verdict on the Parking Lot Claims*

Buyers challenge the jury's verdict for SFI on the parking lot claims, under the causes of action for fraudulent concealment and breach of contract.  They claim the jury was compelled to find for them on those claims.

"Our review of the evidence 'begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the [jury's] determination.'  [Citation.]" (*Moran v. Foster Wheeler Energy Corp.* (2016) 246 Cal.App.4th 500, 517.)  "In making that determination, we '"view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor."'  [Citation.]" (*Ibid.*)  Because Buyers had the burden of proof at trial, they must establish that the evidence compelled a finding in their favor as a matter of law. (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.)  Thus, they must show their evidence was "'"uncontradicted and unimpeached"'" and "'"of such a character and weight as to leave no room for a judicial determination that it

_____

[10]     Buyers cite *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, for the proposition that Scenic's election to proceed with the purchase of unit 2 did not excuse SFI's breach of the implied covenant.  That case is inapposite.  It held only that "the nonperformance by one party of its contractual duties cannot excuse a breach of the duty of good faith and fair dealing by the other party while the contract between them is in effect and not rescinded." (*Id.* at p. 578.)  SFI does not rely on any nonperformance by Scenic; instead, it relies on Scenic's choice to proceed with the transaction and forgo any available contractual remedies under section 3.2 of the Agreement, rather than rescind the contract.

[11]     While the jury found against Buyers on the breach of contract cause of action, as it found that SFI did not breach its obligations, we observe that section 3.2 of the Agreement precluded the telecom claims under that cause of action as well.

16

was insufficient to support a finding.""'" (*Ibid.*) As discussed below, the evidence did not compel a verdict for Buyers on the parking lot claims.

A. *Fraudulent Concealment*

The evidence did not compel a verdict for Buyers on the fraudulent concealment cause of action. The special verdict form, which neither party challenges on appeal, tracked CACI No. 1910's description of the elements of fraudulent concealment by a real estate seller. That formulation required proof that, among other things: (1) the defendant knew but did not disclose certain information to the plaintiff; (2) the plaintiff did not know, and could not reasonably have discovered, this information; (3) the information significantly affected the value or desirability of the property; and (4) the plaintiff was harmed as a result of the defendant's failure to disclose the information. (CACI No. 1910.)

First, as with the misrepresentation causes of action, MLink was the only plaintiff asserting the cause of action for fraudulent concealment. And as with the misrepresentation causes of action, MLink could not establish it was harmed for purposes of fraudulent concealment because it had assigned its rights to the purchase of both buildings and did not take ownership of them.

Regardless, the evidence supported the jury's finding that MLink (or more to the point, Scenic and McCabe Group) could reasonably have discovered the condition of the parking lot's subsoil. The Phase I report informed Buyers that the property's soil contained clay and had "[v]ery slow infiltration rates." The McDonnell report informed Buyers that in 2015, there were "meandering cracks and sections of alligatoring . . . throughout the parking lot," as well as "low-lying areas and depressions," "several areas of surface wear and severe gravelling," and "standing water." And during his testimony, Nguyen confirmed his understanding that "when it rains and there is irrigation runoff, the cracks . . . , graveling, [and] ponding of the parking lot causes water to seep through the asphalt." The jury could reasonably have expected Buyers to put two and two together

17

and realize that the relatively impermeable soil would tend to trap water seeping through the asphalt. And having found that these circumstances alerted Buyers to a potential excessive-moisture problem, the jury could reasonably have expected them to seek the construction file from SFI. (See *Assilzadeh v. California Federal Bank* (2000) 82 Cal.App.4th 399, 411 [seller had no duty to disclose details of construction defect suit involving purchased property, in part because buyer knew about suit and "could have examined the file in its entirety to learn all the details of the suit and its settlement"].) As noted, Blue, an SFI manager, testified SFI had informed Buyers of the prior construction.

Buyers assert that the testimony of McDonnell and Blue conclusively negated any inference that Buyers could reasonably have known about the condition of the subsoil. We disagree. As to McDonnell, Buyers note he testified he was unaware of the soil's saturation at the time of his 2015 report and would not have expected a layperson to deduct from a visual inspection of the parking lot that there was excessive moisture in the soil. But McDonnell did not know at the time of his report that the subsoil contained impermeable clay: while he confirmed he was generally aware that a lot of the soil in the area around Irvine "tend[ed] to have a heavy clay mix," he acknowledged he did not investigate the soil at the properties, as this was outside the scope of his report. And McDonnell confirmed that the Phase I report's description of the soil as clay, with very slow infiltration rates, indicated water penetrating the surface could be trapped. That he would not have expected a layperson to know that there *was* excessive moisture in the subsoil based solely on a visual inspection, does not mean that with the added knowledge of the impermeable soil, a layperson would not be expected to conclude that there *may be* excessive moisture in the soil.

As for Blue, Buyers note he admitted that nothing in the McDonnell report had alerted SFI to a problem with "supersaturated subsoil" in the parking lot area. But Blue testified he still did not think there was any issue with supersaturated subsoil in the

18

parking lot area. Based on his view of the condition of the soil, the jury could reasonably have found his lack of concern from the Phase I and McDonnell reports unilluminating.

While Buyers claim the Terracon report and the construction file revealed that the subsoil-moisture issue was significantly more severe than the prior reports had suggested, the evidence supported a contrary conclusion. The Terracon report noted the existence of groundwater at shallow depth and stated the soil may require drying by aeration or use of an additive. It added that if the schedule did not permit drying by aeration, aggregate and geogrid could be used to stabilize the soil. The construction file showed the construction was in accord with the Terracon report: the contractor used geogrid and aggregate to stabilize the soil. Chapman, Buyers' expert, confirmed that this work did not involve the expensive over-excavation of soil that Buyers claimed was necessary for future projects. Thus, the additional information about the soil in these documents was not outside of Buyers' reach based on the information they possessed from the Phase I and McDonnell reports.

In the same vein, although the jury did not reach this question, the evidence permitted a finding that the information in the Terracon report and the construction file did not significantly affect the value or desirability of the property. For the reasons discussed above, it could reasonably have found that the subsoil-moisture issue reflected in these documents was trivial, as SFI had been able to manage it using relatively modest adjustments. Accordingly, the jury was not compelled to find for Buyers on the fraudulent concealment cause of action.

B. *Breach of Contract*

The evidence similarly did not compel a verdict for Buyers on their breach of contract cause of action. Initially, Buyers' operative complaint asserted a cause of action for breach of contract based only on the telecom leases, not the parking lot's subsoil. A theory that SFI was liable for breach of contract based on the parking lot issue was not before the jury and is not properly before us. (*DiCola v. White Brothers*

19

*Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676 ["'A party is not permitted to change his position and adopt a new and different theory on appeal'"].)

Regardless, even if such a claim had been before it, the jury would not have been required to find for Buyers. To establish a breach of contract, the plaintiff must prove: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*D'Arrigo Bros. of California v. United Farmworkers of America* (2014) 224 Cal.App.4th 790, 800.)

Contrary to Buyers' contention, the jury was not compelled to find that SFI had breached its obligations under the Agreement. Buyers assert that section 2.1 of the Agreement required SFI "to disclose all . . . 'reports and other items and materials related to the property,'" among other things. (Italics and underscoring omitted.) In fact, that provision required SFI to "deliver[] or ma[ke] available to Buyer at [SFI]'s offices or at the Real Property" the specified category of documents. Blue (an SFI manager), Wallace (SFI's real estate expert), and even Barkan (Buyers' real estate expert) testified that it was either typical or not unusual for a seller to avoid producing construction-related documents to the buyer as part of the due diligence materials. Blue and Barkan added that the seller would typically make these documents available for the buyer to review, if the buyer is interested. And Blue testified that SFI had informed Buyers of the prior construction and that Buyers requested no additional information about it. This evidence supported the jury's finding that SFI had properly discharged its obligations under the Agreement. Accordingly, the jury was not compelled to find for Buyers on their breach of contract cause of action.

## DISPOSITION

The judgment is affirmed.  Appellants SFI are awarded their costs on appeal.


O'LEARY, P. J.

WE CONCUR:


SANCHEZ, J.


DELANEY, J.

21